Filed 6/13/13; pub. order 7/1/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SFPP, L.P.,<br><br>    Petitioner,<br><br>       v.<br><br>PUBLIC UTILITIES COMMISSION,<br><br>    Respondent;<br><br>CHEVRON PRODUCTS COMPANY<br>et al.,<br><br>    Real Parties in Interest. | G046669<br><br>(Cal.P.U.C. Dec. Nos. 11-05-045,<br> 12-03-026)<br><br>O P I N I O N |

Original proceedings; petition for a writ of review of decisions of the California Public Utilities Commission. Petition denied.

Mayer Brown, Donald M. Falk, Neil M. Soltman and Eileen Penner for Petitioner.

Frank R. Lindh, Helen W. Yee and Pamela Nataloni for Respondent.

Baker Botts, Thomas J. Eastment, Gregory S. Wagner; Ropers, Majeski, Kohn & Bentley and Susan H. Handelman for Real Parties in Interest BP West Coast Products and ExxonMobil Oil Corporation.

Weber & Associates, George L. Weber; Orrick, Herrington & Sutcliffe and Joseph M. Malkin for Real Party in Interest Chevron Products Company.

Dorsey & Whitney, Martha C. Luemers and Marcus W. Sisk, Jr., for Real Party in Interest Phillips 66 Company.

Venable, Steven A. Adducci, Richard E. Powers, Jr., and Douglas C. Emhoff for Real Parties in Interest Southwest Airlines Co., Ultramar Inc., and Valero Marketing and Supply Company.

McGuireWoods and A. Brooks Gresham for Real Party in Interest Tesoro Refining and Marketing Company.

I

INTRODUCTION

Petitioner SFPP, L.P. (SFPP) is a Delaware limited partnership that operates both intrastate and interstate oil pipelines. SFPP's upstream owners are Kinder Morgan Energy Partners, L.P., a publicly traded partnership, which, through one of its operating partnerships, Kinder Morgan Operating L.P. "D" (which itself is partly owned by Kinder Morgan, Inc.) owns 99.5 percent of SFPP. The other .5 percent is owned by Santa Fe Pacific Pipelines, Inc., a wholly owned, indirect subsidiary of Burlington Northern Santa Fe Corporation.

Respondent Public Utilities Commission of the State of California (the PUC) is the agency charged with regulating public utilities pursuant to Article XII of the

2

California Constitution and the Public Utilities Act,[1] and accordingly, it regulates SFPP's intrastate pipelines.

Real parties in interest Chevron Products Company, Phillips 66 Company, BP West Coast Products LLC, ExxonMobil Oil Corporation, Southwest Airlines Co., Tesoro Refining and Marketing Company, Ultramar Inc., and Valero Marketing and Supply Company (collectively the Shippers) are oil companies and an airline operator that use and pay for SFPP's services on its pipeline facilities.

SFPP petitions for a writ of review of two of the PUC's ratesetting orders, specifically *ARCO Prods. Co. v. Santa Fe Pacific Pipeline, L.P.* (2011) Dec. No. 11-05-045 [2011 Cal.P.U.C. Lexis 299] (*SFPP I* or the Final Decision), and the order on rehearing, *ARCO Prods. Co. v. Santa Fe Pacific Pipeline, L.P.* (2012) Dec. No.12-03-026 [2012 Cal.P.U.C. Lexis 135] (*SFPP II* or the Rehearing Decision) (collectively the Decisions). *SFPP II* granted limited rehearing, modified *SFPP I* in part, and denied rehearing as to all other issues. (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *4.)

"The PUC is not an ordinary administrative agency, but a constitutional body with far-reaching powers, duties and functions. [Citations.] The Constitution confers broad authority on the PUC to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparations, and establish its own procedures. [Citation.]" (*Utility Consumers' Action Network v. Public Utilities Com.* (2004) 120 Cal.App.4th 644, 654.)

The PUC's jurisdiction "includes the authority to determine and fix 'just, reasonable [and] sufficient rates' [citation] to be charged by the utilities." (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792.) The California Supreme Court "has endorsed the commission's position: ''The basic principle [of ratemaking] is to establish a rate which will permit the utility to recover its cost and expenses *plus* a

---

[1] Subsequent statutory references are to the Public Utilities Code unless otherwise noted.

reasonable return on the value of property devoted to public use." [Citation.]'"
(*Southern Cal. Gas Co. v. Public Utilities Com*. (1979) 23 Cal.3d 470, 476.)

SFPP argues the PUC's Decisions made two errors in its ratesetting orders. First, SFPP[2] argues the PUC erroneously denied it a federal income tax allowance because it is a limited partnership instead of a corporation. SFPP strains mightily to frame the PUC's decision as one based on incorrect legal interpretations. It also argues the Decisions are contrary to the PUC's own factual findings, are an abuse of discretion, and are in violation of due process. None of these arguments are supported by the record and the relevant law. In essence, the PUC's decision regarding the treatment of partnerships for tax purposes is a policy question, and thus, not subject to reversal by this court.

Second, SFPP claims the PUC set an unreasonably low return on equity, arguing the PUC used a flawed methodology and failed to use a valid proxy group in its rate calculations. We reject SFPP's arguments on this point as unsupported by the evidence and the Decisions, and conclude the PUC did not abuse its discretion in its calculation of an appropriate return on equity.

II

RELEVANT FACTS AND PROCEDURAL BACKGROUND

The Decisions before us involve numerous consolidated proceedings dating back to 1997. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *2.) In the interests of brevity, we do not detail the entire history of the proceedings, but only those parts relevant to the issues before us.

---

[2] SFPP was previously named Santa Fe Pacific Pipeline, L.P., and is referred to as such in many places in the record. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *2.)

4

In 1991, SFPP sought a rate increase from the PUC for the first time since 1985. It was uncontested, and in 1992, the PUC granted SFPP a 9 percent increase. (*In re SFPP* (1992) 44 Cal.P.U.C.2d 200 [1992 Cal.P.U.C. Lexis 499].)

In 1997, the Shippers filed a complaint with the PUC contesting SFPP's rates. (See *ARCO Prods. Company v. SFPP, LP* (1998) 81 Cal.P.U.C.2d 573 [1998 Cal.P.U.C. Lexis 593] (*ARCO Prods. Company*).) The Shippers asserted that because SFPP was a limited partnership, it does not incur federal income tax liability and its net income after taxes was identical to its net income before taxes. (*Ibid.*) SFPP conceded "that it is a publicly traded partnership which itself incurs and pays no income tax and that its affiliated corporate unitholders may incur no federal income tax liability on income generated by defendant because of the availability of interest payment offsets under a consolidated income tax return. However, defendant argues, the taxable income that is generated by it as a partnership does not escape taxation: It is taken into income by its partners." (*Ibid.*)

Thus, initially, the PUC rejected the Shippers' challenge, noting, with respect to the tax allowance, that the 1992 rate setting was adopted "in full recognition that defendant was organized as a limited partnership." *ARCO Prods. Company v. SFPP, LP*, *supra*, 1998 Cal.P.U.C. Lexis 593 at page 45. In 1999, however, the PUC granted rehearing. (*ARCO Prods. Company v. SFPP, LP* (1999) 1 Cal.P.U.C.3d 418 [1999 Cal.P.U.C. Lexis 442] (*ARCO Prods. Company Rehearing*).)

*ARCO Prods. Company Rehearing* stated: "The Decision held that SFPP should be allowed to include the $ 5.4 million 'tax allowance' in its expenses for ratemaking purposes to prevent this result. This 'tax allowance' was calculated using the corporate tax rate. Although there is logic to this approach, the Decision improperly concludes that this approach must be adopted in order to comply with an established 'tax allowance policy.' The Decision incorrectly reads Application of SFPP, L.P. (Increased Transportation Rates) [D.92-05-018], *supra*, to establish such a policy. When we

5

approved SFPP's 9% rate increase in 1992, we accepted a rate of return calculation that included an expense item for taxes in the amount of $ 6,281,000. At the time, SFPP was a master limited partnership that owned SFPP's two predecessor pipelines. However, Application of SFPP, L.P. (Increased Transportation Rates), [D.92-05-018], *supra*, was decided on an *ex parte* basis and contains no discussion of tax questions. Thus, no conclusion can be drawn from its determination that the total expense amount was reasonable. We generally do not scrutinize applications that are not contested, and have stated this policy explicitly in Re: Commission's Rules of Practice and Procedure [D.95-01-015] (1995) 58 Cal.P.U.C.2d. 480." (*ARCO Prods. Company Rehearing*, *supra*, 1999 Cal.P.U.C. Lexis 442, at pp. *12-13.)

Thus, although the PUC believed "the use of a tax allowance is likely to be permissible" the justification set forth in the 1998 case did not withstand scrutiny. (*ARCO Prods. Company Rehearing*, *supra*, 1999 Cal.P.U.C. Lexis 442 at p. *13) Rehearing was granted to consider tax issues and other matters. (*Ibid.*) Evidentiary hearings were held in October 2000, but the PUC then left the matter undecided until *SFPP I*. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *1 [noting the Decision closes C.97-04-025, the Shippers' 1997 complaint].)

In 2001, SFPP proposed a surcharge to offset increases in power costs. The request was approved, but the PUC directed SFPP to file an application to justify its current rates. The Decisions at issue here address both the income tax allowance issue raised by the Shippers' 1997 complaint and the general rate application that SFPP filed at the PUC's direction.

The PUC issued *SFPP I* in May 2011. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. 1.) As relevant here, the PUC decided that because SFPP is a partnership that pays no income taxes, it is not entitled to an offset for income tax expenses. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at pp. *18-37.) It also approved a return on rate base of 10.40 percent, which included a return on equity of 12.61 percent. (*Id.*, 2011

6

Cal.P.U.C. Lexis 299 at p. *48.) With respect to these issues, *SFPP II* denied SFPP's request for rehearing, although it was granted as to certain other issues not pertinent here. (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *4.)

III

DISCUSSION

A. *Review of PUC Decisions*

"'[A]ny aggrieved party [to a decision of the Commission] may petition for a writ of review in the court of appeal . . . .' [Citation.] As here, when 'writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law because the court considers the case less worthy of its attention than other matters.' [Citation.] We are not, however, 'compelled to issue the writ if the [Commission] did not err . . . . [Citation.]" (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 728-729 (*Pacific Bell Wireless*).)

The limited grounds and standards for our review are set forth in section 1757, subdivision (a). "No new or additional evidence shall be introduced upon review by the court. In a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application that is addressed to particular parties, the review by the court shall not extend further than to determine, on the basis of the entire record which shall be certified by the commission, whether any of the following occurred: [¶] (1) The commission acted without, or in excess of, its powers or jurisdiction. (2) The commission has not proceeded in the manner required by law. (3) The decision of the commission is not supported by the findings. (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record. (5) The order or decision of the commission was procured by fraud or was an abuse of discretion. (6) The order or decision of the commission violates any right of the

7

petitioner under the Constitution of the United States or the California Constitution." Further, we cannot "hold a trial de novo, to take evidence other than as specified by the California Rules of Court, or to exercise [our] independent judgment on the evidence." (§ 1757, subd. (b).)

"There is a strong presumption favoring the validity of a Commission decision. [Citations.]" (*Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537; see also *City and County of San Francisco v. Public Utilities Com.* (1985) 39 Cal.3d 523, 530.) "Generally, we give presumptive value to a public agency's interpretation of a statute within its administrative jurisdiction because the agency may have 'special familiarity with satellite legal and regulatory issues,' leading to expertise expressed in its interpretation of the statute. [Citation.] Therefore, 'the PUC's "interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language. . . ." [Citation.] However . . . the interpretation of statutes is a question of law subject to independent judicial review. [Citation.]' [Citation.]" (*Pacific Bell Wireless*, *supra*, 140 Cal.App.4th at p. 729.)

To the extent section 1757, subdivision (a)(4) is at issue, we use familiar principles to review for substantial evidence. When an administrative agency's evidentiary findings are at issue, "The court must consider all relevant evidence in the record, but '"[i]t is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency."' [Citation.]" (*Eden Hospital Dist. v. Belshé* (1998) 65 Cal.App.4th 908, 915.)

When constitutional issues are raised, we exercise independent judgment on the law and facts. (§ 1760.) Nonetheless, we may not substitute our own judgment "as to the weight to be accorded evidence before the Commission or the purely factual findings made by it. [Citations.]" (*Goldin v. Public Utilities Commission* (1979) 23 Cal.3d 638, 653.)

*B. Income Tax Allowance*

SFPP asserts the PUC "violated applicable law, abused its discretion, and deprived SFPP of due process" by denying it an allowance for income taxes. SFPP therefore claims the PUC's decision on this point is subject to review under section 1757, subdivision (a)(2)-(5). The PUC responds by pointing out that SFPP is a limited partnership, and as such, pays no income taxes. Therefore, SFPP is not entitled to an allowance for taxes it does not pay.

We briefly review the underlying basis for this dispute. The Internal Revenue Code (IRC) treats corporations[3] and partnerships differently for tax purposes. Generally, corporations must pay tax "for each taxable year on the taxable income" of the corporation. (26 U.S.C. § 11(a).) In addition to the income tax paid by a corporation, taxes are also typically paid by shareholders who receive earnings distributions or dividends from corporate income. (26 U.S.C. § 301,(a), (c); see *SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *20.) Partnerships, however, "shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities." (26 U.S.C. § 701.) For tax purposes, a partnership is "merely an agent or conduit through which the income passed." (*United States v. Basye* (1973) 410 U.S. 441, 448, fn. omitted.)

Thus, SFPP, as a partnership, does not pay income taxes. One of its witnesses testified on this point before the PUC. Rather, its upstream partners (various Kinder Morgan entities, for the most part) are allocated SFPP's income and treated as if they had generated it directly.

---

[3] Unless otherwise noted, the term "corporations" refers to "C" corporations rather than "S" corporations.

The PUC's practice is to calculate income tax allowances on a stand-alone basis, without reference to corporate relationships such as holding companies, affiliates, or subsidiaries. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *22.) This policy developed due to the increasing structural complexity of regulated utility entities and the expansion of non-utility activities by subsidiaries. (*Id.*, 2011 Cal.P.U.C. Lexis 299 at pp. *22-23.) "Without the stand-alone treatment of the regulated entity, the non-utility activities could result in a tax expense or savings unrelated to the costs of providing utility service." (*Id.*, 2011 Cal.P.U.C. Lexis 299 at p. *24.) Thus, the PUC looks to the tax liability of the utility alone in calculating any allowance.

As the PUC readily admits, utilities established as corporations, which pay taxes, are entitled to receive an appropriate allowance to cover the tax expense. The Final Decision stated: "SFPP should receive an appropriate allowance for income tax expense, if it is liable for income tax. . . . SFPP has failed to demonstrate that there is a corporate tax liability that should be recovered in rates. [¶] We only provide an allowance where the utility expects to incur an expense. If, for example, SFPP were suddenly able to conduct business entirely without paper, solely using electronic communications, there would no longer be a need to purchase paper, ink, pens, postage, storage boxes, file cabinets, etc. No one would reasonably argue that SFPP should still have a theoretical allowance for paper and pens, and related items included in its expense forecast. If there is no likely expense, there should be no expense forecast in rates. [¶] [I]f there is no taxation on earnings while the earnings are still within the operating control of SFPP, there is no income tax obligation to recognize as a utility operating expense in rates." (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at pp. *27-28, fn. omitted.)

At its essence, SFPP's argument boils down to its claim that an income tax allowance is required as a matter of law, while the PUC and the Shippers assert that it

was a policy choice made after an appropriate process. We address the components of this argument below.[4]

### 1. The PUC's prior decision

SFPP asserts the PUC's "own established income tax doctrine" requires it to grant partnerships an income tax allowance. SFPP relies heavily on a decision involving it that we mentioned earlier, *ARCO Prods. Company*, *supra*, 1998 Cal.P.U.C. Lexis 593 at page *45. In that case, the PUC rejected the Shippers' complaint that an income tax allowance was inappropriate for a limited partnership, noting the ex parte ratesetting in 1992 was adopted "in full recognition that defendant was organized as a limited partnership." (*Ibid.*) SFPP claims the Decisions represent an "about-face" without adequate justification. SFPP completely ignores the 1999 decision on rehearing, *ARCO Prods. Company Rehearing*, *supra*, 1999 Cal.P.U.C. Lexis 442 at page *12.

The 1999 rehearing decision concluded that while there was logic in the approach the PUC had taken in *ARCO Prods. Company,* the justification did not withstand scrutiny. (*ARCO Prods. Company Rehearing*, *supra*, 1999 Cal.P.U.C. Lexis 442 at pp. *12-13.) Further, the PUC stated it needed "to consider the issue more carefully" because it had no established policy in this area. (*Ibid.*) Rehearing prevented the original decision from ever becoming final. (*City of Los Angeles v. Public Utilities Com.* (1975) 15 Cal.3d 680, 707.) Thus, the Decisions do not represent a sudden departure from over a decade of precedent, as SFPP suggests. The PUC had already rejected its 1998 rationale in 1999.

---

[4] While SFPP's writ petition asserts seven different reasons the PUC erred on this point, many of these arguments overlap and duplicate each other. Further, in its reply, it often claims to be replying to arguments it claims the PUC made without citing to the PUC's brief. In the interests of convenience and avoiding repetition, we shall group similar arguments together.

11

### 2. *Competing authorities*

SFPP correctly states that the Federal Energy Regulatory Commission (FERC) and some state jurisdictions grant partnerships an income tax allowance on the grounds that the tax paid by the partners is an operating cost. (See *Policy Statement on Income Tax Allowances* (2005) 111 F.E.R.C. P61,139, 2005 FERC Lexis 1129; *Suburban Utility Corp. v. Public Utility Com.* (Tex. 1983) 652 S.W.2d 358; *Moyston v. New Mexico Pub. Serv. Comm'n.* (N.M. 1966) 412 P.2d 840; *Home Tel. Co. v. State Corp. Comm'n.* (2003) 31 Kan.App.2d 1002; *Washington Utilities & Transp. Com'n. v. Rainier View Water Co.* (July 12, 2002) 2002 Wash. UTC Lexis 323; *In re Detroit Thermal, LLC* (Sept. 8, 2005) 2005 Mich. PSC Lexis 293; *In the Matter of the Commission's Generic Evaluation of the Regulatory Impacts from the Use of Non-Traditional Financing Arrangements by Water Utilities and Their Affiliates* (Feb. 21, 2013) 2013 Ariz. P.U.C. Lexis 58.)

We note, however, that a number of other jurisdictions have not permitted income tax allowances for pass-through entities in the recent past. (See *South Haven Waterworks, Div. v. Office of Utility Consumer Counselor* (Ind.Ct.App. 1993) 621 N.E.2d 653;[5] *Monarch Gas Co. v. Illinois. Commerce Com.* (51 Ill.App.3d 1977) 366 N.E.2d 945; *Penn. Public Utility Com. v. Jackson Sewer Corp.* (Sept. 28, 2001) 2001 Pa. P.U.C. Lexis 53; *Farmton Water Resources LLC* (Oct. 8, 2004) 2004 Fla. P.U.C. Lexis

---

[5] SFPP claims this decision is "no longer good law," but that is at best unclear. SFPP cites to *Petition of Hamilton Southeast Utilities, Inc.* (Aug. 18, 2010) 2010 Ind. P.U.C. Lexis 282. SFPP argues this opinion states "the *South Haven* decisions were explicit predicated on an evidentiary failure, so that any legal holdings on the point were therefore 'dicta.'" First, we are unaware that a public utilities commission in any state has the ability to declare that an appellate court decision is "no longer good law." Second, the commission only stated *its own* statements were "dicta," not the court's. (*Id.*, 2010 Ind. P.U.C. Lexis 282 at p. *62.) While the Indiana commission may have changed its position, it would be equally supported by the law if it wished to deny an income tax allowance.

863; *Ridgelea Inv., Inc.* (Oct. 14, 2008) 2008 Ky. P.U.C. Lexis 1259; *Concord Steam Corp.* (Nov. 16, 1986, Order No. 18,484) 71 N.H. P.U.C. 667.)

We need not delve into the competing rationales at play here. Our only concern is whether the PUC's decision violated the law in some way which requires this court to step in. (§ 1757.) Our review of these cases demonstrate competing *policy* interpretations, but not, in contrast to SFPP's argument, a legally compelled result in any particular direction. Indeed, upon review of FERC's decision to permit income tax allowances to partnerships, the D.C. Circuit described the decision as including "troubling elements," yet deferred to FERC as a matter of *policy*. (*ExxonMobil Oil Corp. v. F.E.R.C.* (D.C. Cir. 2007) 487 F.3d 945, 948.) "[P]olicy choices about ratemaking are the responsibility of the Commission—not this Court. [Citation.]" (*Id.* at p. 953.)

Further, the fact that some states made their decisions before FERC's policy statement is not of particular import, as SFPP does not argue federal preemption. While SFPP's side of this argument may have more jurisdictions behind it at this point in time, that is not particularly relevant, as policy decisions left to individual states are not subject to a popularity contest.

SFPP has not demonstrated the law requires the PUC to grant partnerships an income tax allowance, nor do we agree that the SFPP "arbitrarily" failed to address FERC's reasoning. The Decisions reflect the PUC was clearly aware of FERC's different policy choice on this point, and thus, the record does not support SFPP's claim the PUC arbitrarily and capriciously refused to consider FERC's reasoning. Given that SFPP vehemently disagrees, its remedy is with the legislature, and not, given our limited scope of review, with this court.

### 3. The PUC's understanding of the relevant law

SFPP argues the PUC's decision was based on an erroneous view of the law, lacked substantial evidence, and should therefore be vacated pursuant to section

13

1757. SFPP claims the decision "rests entirely on findings that are wrong as a matter of governing federal tax law." SFPP claims the PUC incorrectly concluded that the partners incurred a personal income tax obligation only after the partnership distribution, which it argues is untrue. Further, any income tax obligation accrues while the income is still in control of the partnership.

Contrary to SFPP's claims, the Final Decision reflects the PUC was aware of the relevant income tax obligations. "SFPP itself does not directly pay tax on the income it generates because SFPP is organized as a limited partnership. However, this does not mean that income generated by SFPP is necessarily tax-free. SFPP's income could be eventually taxable in the hands of SFPP's upstream owners, regardless of the amount of cash SFPP actually distributes to them. The amount of tax paid on income SFPP generates depends on the tax situation of each of its owners—including the possibility that the tax obligation may be passed on to a further, indirect owner of SFPP." (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *19.) In the Rehearing Decision, the PUC repeated: "The Decision clearly shows that we did understand that SFPP's partners are responsible for any tax on its earnings." *(SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *7.) Rather, the PUC rejected SFPP's preferred method of treating the partnership as the tax-paying entity for purposes of setting rates. (*Ibid.*)

SFPP also argues that the stand alone doctrine, which, as we previously noted, treats utilities as separate from any affiliates for ratemaking purposes, compels the PUC to grant partnerships an income tax allowance. Arguing that the PUC has granted allowances to corporations even if their parent pays taxes as part of a consolidated return, SFPP argues this is no different from the tax a partner pays on SFPP's income. As the PUC accurately explains, however, this ignores that a corporate utility and its parent each have a separate income tax liability. Thus, while a parent may pay the tax on a consolidated return, the utility is still responsible for the tax separately. That is not true

14

of a partnership. We therefore disagree that the stand alone doctrine requires partnership income tax allowances.

SFPP has not established that the PUC used "legally erroneous principles," in denying an income tax allowance; it would simply prefer a different policy.[6] Indeed, the Decisions show the PUC fully understood the relevant principles of federal tax law, and applied two long-standing policies. First, as noted above, the PUC calculates income tax allowances on a stand-alone basis, without regard to other related entities. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *22.) Second, to protect ratepayers, only legitimate, actual expenses incurred by the utility are recognized as part of the ratemaking process. (*City and County of San Francisco v. Public Utilities Com.* (1971) 6 Cal.3d 119, 129.) The PUC applied both of these principles in reaching its decision.

Similarly, we reject SFPP's argument that the PUC abused its discretion and based its decision on a misunderstanding of the economic consequences of denying an income tax allowance to partnerships. To the extent SFPP's argument on this point is not conclusory, no "misunderstanding" is supported by the record.

### 4. Due Process

SFPP also contends it was denied a reasonable opportunity to develop an evidentiary record on its actual or potential liability, and was therefore denied due process. Specifically, it claims the PUC predicated its decision on an evidentiary standard that did not exist until the Final Decision. This standard, also known as the "FERC test," refers to FERC's requirement, established in its 2005 *Policy Statement on Income Tax Allowances*, requiring partnerships to provide evidence of evidence of actual

---

[6] We also reject SFPP's argument that the PUC's ruling conflicts with its own findings of fact. This is another way of saying the PUC did not understand the law.

15

or potential taxes in order to calculate an income tax allowance, rather than relying on the corporate tax rate.

While SFPP claims the PUC "endorse[d]" the FERC test, this is a confusing assertion, given the PUC explicitly rejected the underlying policy that made the FERC test relevant. As far as the PUC is concerned, the only "actual or potential" tax liability that matters is federal income tax liability at the organizational level, of which SFPP, as a partnership, has none. (26 U.S.C. § 701.) SFPP appears to be engaging in an out-of-context reading of the Decisions to support this argument. For example, the Final Decision mentions that "SFPP would fail the current FERC test on the record in this proceeding," (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *35) but that was not the basis for the PUC's decision. Rather, the Final Decision explicitly rejected the adoption of FERC's rule with regard to tax allowances for partnerships, noting: "In this instance, we do not need our ratemaking determinations to match with FERC's ratemaking, because this Commission must also act within the scope of its discretion, and act reasonably on its record." (*Id.*, 2011 Cal.P.U.C. Lexis 299 at p. *37.) Instead, it concluded: "We find that SFPP does not have 'an actual or potential income tax obligation on the entity's public utility income' in addition to the personal tax obligation of the partners after the partnership distribution." (*Ibid.*)

On rehearing, the PUC made clear that policy, not a lack of evidence, compelled its decision: "Because SFPP pays no income tax itself, the Decision found it was not entitled to an income tax allowance for ratemaking purposes." *(SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *6, fn. omitted.) "The Decision clearly shows that we did understand that SFPP's partners are responsible for any tax on its earnings. What we rejected was SFPP's suggestion that SFPP and its partners are one and the same. Partnerships are viewed as 'independently recognizable entities apart from the aggregate of their partners' for income tax purposes." (*Id.,* 2012 Cal.P.U.C. Lexis 135 at p. *7, fns.

16

omitted.)  Thus, given the PUC rejected the policy on which SFPP's claimed assertion for new evidence is based, its due process claim lacks merit.[7]

*C.  Return on Equity*

SFPP next argues the PUC abused its discretion by setting an unreasonably low rate of return on equity based on incorrect legal standards.  While SFPP wanted a return on equity of 15.86 percent, the PUC adopted a rate of 12.61 percent.  The Shippers recommended a rate of 12.28 percent.  (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *18.)

We begin by reviewing the relevant ratemaking principles.  It is well-settled that a utility is entitled to a reasonable return on its rate base, that is, "the value of the property which it employs for the convenience of the public . . . ."  (*Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n.* (1923) 262 U.S. 679, 692.)  A reasonable return is one which is "generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but [the utility] has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures."  (*Id.* at pp. 692-693.)  While the return on equity "should be sufficient to provide a margin of safety for payment of interest and preferred dividends, to pay a reasonable common dividend, and to allow for some money to be kept in the business as retained earnings," the PUC "must set the ROE at the lowest level that meets the test of reasonableness."  (*Application of Pacific Gas and Electric Company* (Cal.P.U.C. Nov. 7, 2002) 221 P.U.R.4th 501, 510 [2002 Cal.P.U.C. Lexis 718 at p. *27]

---

[7] Moreover, as the Rehearing Decision notes, SFPP had the opportunity after FERC issued its policy statement to present additional evidence to the administrative law judge, but chose not to do so.  (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *10.)

17

(*PG&E*); see also *In Re Application of Pacific Gas and Electric Company* (Cal.P.U.C. Nov. 23, 1992) 46 Cal.P.U.C.2d 798 [1992 Cal.P.U.C. Lexis 798 at p. *161].)

"The Commission examines several cost components in calculating a utility company's revenue requirement. The Commission begins by determining the value of the assets that the company has invested in to provide utility service . . . . This figure is known as the 'rate base.'" (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 51 (*Ponderosa*).) "To invest in rate base assets, a utility company raises funds by either issuing debt or selling equity. Costs are associated with each method. The company either has to pay interest to creditors on borrowed funds or pay a portion of profits or dividends to equity investors, i.e., shareholders. This cost is known as the cost of capital. The cost of capital, also known as the rate of return, multiplied by the rate base is one component of the utility company's revenue requirement." (*Ibid.*) In most instances, a mix of debt financing and equity is used. (*Ibid.*)

"The Commission determines a utility company's cost of capital in a three-step process. The Commission first adopts a reasonable capital structure, i.e., the proportion of debt to equity that a utility company should use to finance its capital needs. Next, the Commission calculates the company's cost of debt, based on the actual cost of the company's outstanding debt during the most recent period. Third, the Commission determines the appropriate return on the equity component of the utility company's capital by examining returns for businesses with comparable risks. Applying the resulting figures to the adopted capital structure produces the weighted cost of capital. This weighted cost of capital becomes the utility company's authorized rate of return on rate base." (*Ponderosa*, *supra*, 197 Cal.App.4th at pp. 51-52.) Finally, "the Commission determines the utility company's rate base and multiplies that number by the authorized rate of return. This figure is then added to the company's operating expenses and tax costs. The sum is the company's revenue requirement, i.e., the amount needed to cover the company's costs and provide a reasonable return on its investments." (*Id.* at p. 52.)

In order to determine the numbers that go into the PUC's analysis, several financial models are used as a starting point. One of these is the discounted cash flow (DCF) analysis. (*PG&E*, *supra*, 2002 Cal.P.U.C. Lexis 718 at pp. *24-25.) Although the models themselves are subjective, the results depend on subjective inputs, which result in a wide range of recommend returns. (*Ibid*; see also *Application of California Water Service Company* (Cal.P.U.C. 2009) 272 P.U.R.4th 512, 524 [2009 Cal.P.U.C. Lexis 233 at p. *36].) "In the final analysis, it is the application of informed judgment, not the precision of financial models, which is the key to selecting a specific ROE estimate. [A]s we have routinely stated in past decisions, the models should not be used rigidly or as definitive proxies for the determination of the investor-required return on equity. Consistent with that skepticism, we find no reason to adopt the financial modeling of any one party. The models are only helpful as rough gauges of the range of reasonable outcomes." (*Ibid*.)

According to *SFPP I,* the PUC adopted SFPP's proposed capital structure of 60 percent equity and 40 percent debt. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *48.) It also determined the cost of debt was 7.08 percent. (*Ibid.*) The PUC concluded that "it is within our discretion, and within the recommended range, to adopt a return of 12.61% on equity, which yields a weighted cost of capital for test year 2003 of 10.40%. The equity return is significantly higher than the rate adopted for the major energy distribution utilities, and is slightly higher than the recommendation of intervenors. When viewed with the 60% equity ratio, this return should be a sufficient to compensate investors for the operating and financial risks associated with SFPP's operations." (*Id.*, 2011 Cal.P.U.C. Lexis 299 at pp. *48-49.)

The Final Decision also reflects that the return on investment recommended by SFPP and the Shippers differed significantly, based on the financial model used. (*SFPP I*, *supra*, 2011 Cal.P.U.C. Lexis 299 at p. *47.) The PUC noted the recommendations with approved returns on equity for four non-pipeline utilities, using

19

2003 as a test period. (*Id.*, 2011 P.U.C. Lexis 299 at pp. *42-49.) The compared returns on equity ranged from 10.9 percent to 11.6 percent, returns lower than either SFPP or the Shippers recommended. (*Id.*, 2011 Cal.P.U.C. Lexis 299 at pp. *46-48.) The Final Decision noted significant differences between SFPP, underscoring "the need to evaluate rate of return on a case-by-case basis." (*Id.*, 2011 Cal.P.U.C. Lexis 299 at p. 47.) Using the parties' models as a "starting point" (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *19), the PUC then "exercised our discretion to make pragmatic adjustments to the recommended outcomes . . . ." (*Ibid.*)

Essentially, SFPP complains that the PUC did not use validly calculated recommended returns on equity based on a valid proxy group with comparable risks. First, it claims the PUC "erred in endorsing the Shippers' proposed ROE as a valid lower reference point, then closely adhering to that figure." According to SFPP, the Shippers' proposal was based on "discounted income" rather than "discounted cash flow."

There is no evidence, however, that the PUC endorsed any specific recommendation. As the Rehearing Decision stated: "DCF analyses are merely one tool the Commission uses as a starting point to estimate a fair ROE. And all financial models have certain flaws. For that reason, they are not rigidly applied or viewed as definitive proxies to determine ROE. They are merely used to provide a rough gauge of the range of reasonable outcomes." (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at pp. *18-19, fn. omitted.) The fact that the return on equity the PUC ultimately adopted was closer to the Shippers' recommendation than SFPP's proves nothing.

Nor do we accept SFPP's implication that there is only one acceptable DCF methodology. As the PUC points out, even SFPP's analysis used multiple variations. Further, the law does not "'bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. . . .' [Citations.]" (*City of Los*

20

*Angeles v. Public Utilities Com.*, *supra*, 15 Cal.3d at p. 698.)  We must therefore reject SFPP's argument on this point.

Second, with respect to the appropriateness of the proxy group, SFPP contends the PUC either used an inappropriate group or none at all.  As noted above, utilities are usually entitled to earn a return similar to those of other companies having similar business risks.  (*Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n.*, *supra*, 262 U.S. at pp. 690, 692.)  Companies used for such comparisons are referred to as proxy groups.  SFPP argues the PUC either considered an inappropriate proxy group or none at all.

The record does not support this conclusion.  With respect to the claim the PUC used an inappropriate comparison group of non-pipeline utilities, the Rehearing Decision clarifies that is not what occurred.  "SFPP is wrong that the Decision relied on a proxy group of energy utilities for purposes of the ROE analysis. We did generally note the authorized ROEs for Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and Sierra Pacific Power Company during the same 2003 time frame.  However, we specifically stated that the differences between SFPP and energy utilities required that we evaluate authorized returns on a case-by-case basis."  (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *16, fns. omitted.)  Thus, SFPP's argument that these companies were used as a proxy group is incorrect.

If that is not the case, SFPP claims, then the PUC used no proxy group at all, which is equally problematic.  But this, too, is unsupported by the record.  Both SFPP and the Shippers agree they used the same proxy group of five publicly traded oil pipelines in their own DCF analyses.  As the Rehearing Decision noted, the PUC "reviewed the DCF analyses presented by both parties . . . ."  (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *19.)  Thus, the Shippers argue, and we agree, the PUC necessarily considered this group "to provide a rough gauge of the range of reasonable outcomes."  (*Ibid.*, fn. omitted.)  We must therefore reject SFPP's contention that the

21

PUC relied on no proxy group at all. The fact that the PUC did not discuss the proxy groups at length is not evidence it did not consider them.

Further, as the PUC stated, "It is also relevant to note that this Commission regulates very few oil pipeline companies that we can look to for comparison purposes." (*SFPP II*, *supra*, 2012 Cal.P.U.C. Lexis 135 at p. *16.) While SFPP criticizes this statement and urges the PUC to draw from "public information" about other pipelines in what it considers to be a valid proxy group, there is no legal requirement for the PUC to do so. As the PUC points out, "Nothing in the record provided a meaningful factual comparison or analysis of the relative risks and uncertainties of those entities."

Finally, a proxy group is just one element of many the PUC considers in setting rates. There is no support in the record that the PUC abused its discretion in doing so here.

## IV

## DISPOSITION

The petition for writ of review is denied. Respondent and real parties in interest are entitled to their costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.

22

**Filed 07/01/13**

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SFPP, L.P., <br><br> Petitioner, <br><br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent; <br><br> CHEVRON PRODUCTS COMPANY et al., <br><br> Real Parties in Interest. | G046669 <br><br> (Cal.P.U.C. Dec. Nos. 11-05-045, 12-03-026) <br><br> ORDER GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |

Respondent has requested that our opinion, filed on June 13, 2013, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.

23