Filed 5/29/14; pub. & mod. order 6/27/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CLEAN ENERGY FUELS CORP., | |
| Petitioner, | G048820 |
| v. | (CPUC Nos. D.12-12-037 & D.13-10-042) |
| CALIFORNIA PUBLIC UTILITIES COMMISSION, | O P I N I O N |
| Respondent, | |
| SOUTHERN CALIFORNIA GAS COMPANY, | |
| Real Party in Interest. | |

Original proceedings; review of decisions of the Public Utilities Commission of the State of California. Decisions affirmed.

Goodin, MacBride, Squeri, Day & Lamprey, Thomas J. MacBride, Anne H. Hartman; Alcantar & Kahl, Evelyn Kahl and Katherine Rosenberg for Petitioner.

Frank R. Lindh, Helen W. Yee and Monica McCrary for Respondent.

Steven D. Patrick, Jason Egan; Jones Day, Charles C. Read and Haley McIntosh for Real Party in Interest.

*          *          *

Clean Energy Fuels Corp. (Clean Energy) files petitions for writ of review to challenge the California Public Utilities Commission's (PUC) decisions approving Southern California Gas Company's (SoCalGas) application for a "Compression Services Tariff." Under the tariff, SoCalGas would design, build, own, operate, and maintain equipment on nonresidential customers' property to compress, store, and dispense natural gas above standard line pressure for customer end-use applications, including natural gas vehicle refueling, combined heat and power facilities, and peaking power plants.

Clean Energy contends we must annul the PUC's decisions because the competitive advantages SoCalGas has as a regulated monopoly utility allows it to unfairly compete with nonutility enterprises in the unregulated compressed natural gas market. According to Clean Energy, the PUC's decisions approving the Compression Services Tariff are inconsistent with approximately 20 years of PUC precedent establishing policies and rules to promote the development of alternative fuel vehicle markets through fair competition. Clean Energy also contends the PUC failed to make adequate findings explaining its reasons for rejecting Clean Energy's proposal to have SoCalGas provide the proposed compression services through an unregulated affiliate that cannot exploit SoCalGas's competitive advantages. Finally, Clean Energy challenges the sufficiency of the evidence to support the PUC's findings the Compression Services Tariff will expand the use of compressed natural gas in the Los Angeles area and thereby reduce air pollution and greenhouse gas emissions.

We affirm the PUC's decisions approving the Compression Services Tariff. The PUC's decisions acknowledge SoCalGas's monopoly status could provide it with unfair competitive advantages over nonutility enterprises, and therefore the PUC imposed

2

several reporting, cost tracking, and marketing restrictions on SoCalGas to prevent it from unfairly competing. With those restrictions in place, the PUC determined the Compression Services Tariff does not provide SoCalGas unfair competitive advantages and PUC precedent supports adoption of the tariff. We conclude the evidence in the record and the PUC's findings support those determinations and the PUC's rejection of Clean Energy's unregulated affiliate proposal. We also conclude substantial evidence supports the PUC's findings the Compression Services Tariff will increase natural gas use and thereby reduce air pollution and greenhouse gas emissions.

I

FACTS AND PROCEDURAL HISTORY

SoCalGas is a public utility and regulated monopoly provider of natural gas for all of Southern California except San Diego. The PUC regulates SoCalGas by establishing the official rates and terms of its service through various tariffs and rules.[1] SoCalGas delivers natural gas to its customers at standard pressures that range from one-third of a pound per square inch to several hundred pounds per square inch depending on where the customer connects to SoCalGas's distribution system. SoCalGas does not guarantee nonstandard pressure levels under its standard tariff terms.

SoCalGas's Tariff Rule No. 2, however, states nonstandard "delivery pressures can be provided upon request and acceptance by [SoCalGas]," including any "pressure as [SoCalGas] and the Customer agree to." Tariff Rule No. 2 authorizes

---

[1] "'Tariffs' refer collectively to the sheets that a utility must file, maintain, and publish as directed by the [PUC], and that set forth the terms and conditions of the utility's services to its customers." (PUC General Order 96-B, § 3.15, p. 4; *Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1097 (*Southern Cal. Edison*) ["tariff – 'a schedule "showing all rates, tolls, rentals, charges, and classifications . . . together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service"'" (footnote omitted)].)

3

SoCalGas to enter into special commercial agreements with customers to plan, build, own, operate, and maintain special facilities to deliver gas under pressure conditions that depart from standard system pressure conditions at the customer's location. The PUC's General Order No. 58-A, entitled Standards for Gas Service in the State of California, further authorizes SoCalGas and all other regulated gas providers to supply gas at nonstandard pressure upon a customer's request.

In November 2011, SoCalGas applied for PUC approval to expand its compression services and establish more uniform service terms. SoCalGas's application explained it sought to provide "a new tariff service . . . to meet the current and future needs of non-residential customers requiring natural gas compression above standard line pressure for customer end-use applications. Examples of customer end-use applications that can be served under the proposed tariff include Natural Gas Vehicle . . . refueling operations, Combined Heat and Power . . . facilities, and peaking power plants."

Under the Compression Services Tariff, "SoCalGas will design, procure, construct, own, operate, and maintain on customer premises, equipment associated with the compression of natural gas in order to meet customer-specified pressure requirements." "SoCalGas will not, however, conduct activities beyond the point of the customer's receipt of compression service and, as a consequence, will neither own, operate, or maintain facilities nor conduct business operations beyond the point of service delivery." "SoCalGas will price the tariff via a [standardized] service contract that includes cost and rate components, adjustments, performance requirements and payment terms agreed upon in advance by the customer and SoCalGas."

Clean Energy "is the largest provider of natural gas fuel for transportation in North America and a global leader in the expanding natural gas vehicle market." It competes with more than 35 other companies in Southern California to design, build, own, operate, and maintain natural gas vehicle refueling stations. At the time of the tariff application, Clean Energy had built 62 natural gas vehicle refueling stations in

4

SoCalGas's service area (23 percent of the stations), and combined with one other competitor (Integrys Transportation Fuels, LLC) to service 82 percent by volume of all compressed natural gas in SoCalGas's service area. SoCalGas supplies the natural gas for Clean Energy's customers; Clean Energy simply compresses that gas to the pressure required by its customers' natural gas vehicles. To bid and construct a refueling station, Clean Energy requires information from SoCalGas concerning its supply line to Clean Energy's customers and also requires SoCalGas's cooperation to connect Clean Energy's facilities to SoCalGas's distribution system.

Clean Energy filed a protest with the PUC to challenge SoCalGas's Compression Services Tariff. The opposition argued SoCalGas's status as the monopoly gas supplier for customers within its service area enables SoCalGas to unfairly compete with Clean Energy and all other compression service providers, and therefore approval of the Compression Services Tariff would be inconsistent with approximately two decades of PUC decisions establishing policies and rules to promote the development of alternative fuel vehicle markets through fair competition. (See *Opinion on Low Emission Vehicle Policy Guidelines* (July 21, 1993) 145 P.U.R.4th 243 [1993 Cal. PUC Lexis 574] (*Phase I LEV Guidelines*); *Opinion on Low Emission Vehicle Policy Guidelines Phase II* (Nov. 21, 1995) 165 P.U.R.4th 503 [1995 Cal. PUC Lexis 978] (*Phase II LEV Guidelines*); *Opinion Adopting Standards of Conduct Governing Relationships Between Utilities and Their Affiliates* (Dec. 16, 1997) 183 P.U.R.4th 503 [1997 Cal. PUC Lexis 1139] (*Affiliate Transaction Rules*); *Phase 2 Decision Establishing Policies to Overcome Barriers to Electric Vehicle Deployment and Complying with Public Utilities Code Section 740.2* (July 14, 2011) 292 P.U.R.4th 169 [2011 Cal. PUC Lexis 394] (*Electric Vehicle Policies*).) According to Clean Energy, the PUC's decision in *Affiliate Transaction Rules* required an unregulated affiliate of SoCalGas to provide the proposed services under the Compression Services Tariff because it would not share any of the ratepayer resources available to SoCalGas as a monopoly utility (Affiliate Option).

5

In June 2012, an administrative law judge conducted a two-day evidentiary hearing on SoCalGas's application. The judge issued a proposed decision approving the application in November 2012, and the PUC approved that decision in December 2012 after considering objections from Clean Energy and others. PUC Decision No. 12-12-037 approved SoCalGas's Compression Services Tariff subject to several reporting, cost tracking, and marketing restrictions designed to protect ratepayers and prevent SoCalGas from unfairly competing in the compressed gas services market. With the restrictions it imposed, the PUC found the new tariff "is in the public interest because it offers additional choice to consumers and makes more widely available a service that reduces the health and environmental impacts from air pollution, reduces greenhouse gas emissions, and will lead to an increase in the use of natural gas, an alternative to gasoline and diesel fuel."

The restrictions the PUC imposed on SoCalGas's Compression Services Tariff include (1) prohibiting SoCalGas from using bill inserts to promote the Compression Services Tariff; (2) requiring SoCalGas to use competitively neutral scripts approved by the PUC when responding to any customer inquiries regarding compressed natural gas services; (3) requiring SoCalGas to post on its Web site competitively neutral information about the Compression Services Tariff that also identifies all other companies offering the same or similar compression services; (4) requiring SoCalGas to provide equal treatment to customers seeking compression services from SoCalGas and customers seeking compression services from other providers; (5) requiring SoCalGas to file a "semiannual report pertaining to its provision of services needed to prepare for the receipt of compressed natural gas by utility and non-utility customers"; and (6) requiring SoCalGas to establish balancing and tracking accounts and to price its compression

6

services to ensure the customers receiving those services bear all costs and risks, and that ordinary ratepayers do not subsidize the services.[2]

The required semiannual report must be served on all parties participating in the administrative proceedings on the Compression Services Tariff and must include (1) information on the total volume of compressed gas services provided in SoCalGas's service territory and the volume of compressed gas services provided under the Compression Services Tariff; (2) information on several specific performance indicators showing how SoCalGas treated projects under the Compression Services Tariff and projects undertaken by other compression services providers; (3) SoCalGas management certifications stating "no preference has been shown to any [Compression Services Tariff] project in the provision of gas service by SoCalGas"; and (4) "Customer certification forms from each [Compression Services Tariff] customer verifying their awareness that the [tariff] is an optional tariff, that taking service under the [tariff] provides no preference in the provision of any service from SoCalGas, that they are aware that the same or similar services as the [tariff] may be provided by others and that they have received a list of such providers."

Claiming the PUC made numerous legal and factual errors in approving SoCalGas's Compression Services Tariff, Clean Energy applied to the PUC for a rehearing. When the PUC failed to take action on the rehearing application, Clean Energy filed its original petition for writ of review asking this court to review Decision No. 12-12-037. In October 2013, the PUC issued Decision No. 13-10-042 to modify Decision No. 12-12-037 and deny Clean Energy's rehearing application.[3] Decision

---

[2] As the Decisions explain, a balancing account is a "mechanism to credit back ratepayers for the use of services that are paid through the utilities embedded costs," and a tracking account "track[s] both the costs and revenues related to a specific project."

[3] We refer to Decision No. 12-12-037 and Decision No. 13-10-042 collectively as the Decisions.

No. 13-10-042 clarified some of the findings made in Decision No. 12-12-037 and issued a few additional findings to address some of Clean Energy's contentions, but Decision No. 13-10-042 otherwise approved SoCalGas's Compression Services Tariff subject to the same restrictions Decision No. 12-12-037 imposed. All parties stipulated to allow Clean Energy to file an amended petition for writ of review restating its challenges to the PUC's approval of the Compression Services Tariff based on both Decisions.

II

DISCUSSION

A.      *The PUC and the Standard of Review*

"[The PUC] is the agency charged with regulating public utilities pursuant to article XII of the California Constitution and the Public Utilities Act . . . ." (*SFPP, L.P. v. Public Utilities Com.* (2013) 217 Cal.App.4th 784, 790 (*SFPP*).) "'[It] is authorized to supervise and regulate public utilities and to "do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction" [citation]. . . . Adverting to these provisions, we have described [the] PUC as "'a state agency of constitutional origin with far-reaching duties, functions and powers'" whose "'power to fix rates [and] establish rules'" has been "'liberally construed.'"' [Citation.]" (*City of Huntington Beach v. Public Utilities Com.* (2013) 214 Cal.App.4th 566, 584 (*Huntington Beach*); *SFPP*, at p. 790 ["'The PUC is not an ordinary administrative agency, but a constitutional body with far-reaching powers, duties and functions'"].) Here, all parties agree the PUC had jurisdiction to approve SoCalGas's Compression Services Tariff under its ratemaking authority.

PUC decisions must "contain, separately stated, findings of fact and conclusions of law . . . on all issues material to the order or decision." (Pub. Util. Code,

8

§ 1705.)[4] "'Every issue that must be resolved to reach that ultimate finding is "material to the order or decision,"' and findings are required of the basic facts upon which the ultimate finding is based. [Citations.] [¶] . . . [S]uch findings afford a rational basis for judicial review and assist the reviewing court to ascertain the principles relied upon by the [PUC] and to determine whether it acted arbitrarily, as well as assist parties to know why the case was lost and to prepare for rehearing or review, assist others planning activities involving similar questions, and serve to help the [PUC] avoid careless or arbitrary action. [Citation.]" (*Greyhound Lines, Inc. v. Public Utilities Com.* (1967) 65 Cal.2d 811, 813.)

Any party aggrieved by a PUC decision may petition the court of appeal or Supreme Court for a writ of review to "hav[e] the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined." (§ 1756, subd. (a).) Our review of the PUC's Decisions on SoCalGas's Compression Services Tariff is "circumscribed" (*Huntington Beach*, *supra*, 214 Cal.App.4th at p. 583) and may extend no further than to determine, on the basis of the entire record, whether (1) the PUC "acted without, or in excess of, its powers or jurisdiction"; (2) the PUC failed to proceed in the manner required by law; (3) the PUC's findings do not support its decision; (4) the PUC's findings are not supported by substantial evidence in the record; (5) the PUC's decision "was procured by fraud or was an abuse of discretion"; and (6) the PUC's decision "violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a).) In conducting our review, we are *not* permitted to "to hold a trial de novo, to take evidence other than as specified by the California Rules of Court, or to exercise [our] independent judgment on the evidence." (§ 1757, subd. (b).)

---

4       All statutory references are to the Public Utilities Code unless otherwise stated.

9

"'There is a strong presumption of validity of the [PUC's] decisions [citations], and [its] interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language [citations].' [Citation.]" (*Ames v. Public Utilities Com.* (2011) 197 Cal.App.4th 1411, 1418.) Similarly, the PUC's interpretation of its own regulations and decisions "is entitled to consideration and respect by the courts. . . . '"A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another."' [Citation.]" (*Southern Cal. Edison*, *supra*, 85 Cal.App.4th at p. 1096.) With those principles in mind, the interpretation of statutes and regulations nonetheless remains a question of law subject to our independent review. (*Ibid.*)

We review any challenge to the evidentiary support for the PUC's findings under the substantial evidence standard: "'The court must consider all relevant evidence in the record, but '"[i]t is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency.'" [Citation.]' [Citation.]" (*SFPP*, *supra*, 217 Cal.App.4th at p. 794.) "[T]he findings of fact by the [PUC] are to be accorded the same weight that is given to jury verdicts and the findings are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence. [Citation.] . . . 'When conflicting evidence is presented from which conflicting inferences can be drawn, the [PUC's] findings are final.' [Citation.]" (*Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537-538 (*Toward Utility Rate Normalization*).)

We previously issued a writ of review and ordered the PUC to prepare and certify the record of its proceedings. We now proceed to consider the merits of Clean Energy's challenges.

10

B.      *The Compression Services Tariff Does Not Allow SoCalGas to Unfairly Compete*

Section 740.3 requires the PUC to work with SoCalGas and all other regulated utilities to establish policies and programs to "promote the development of equipment and infrastructure needed to facilitate the use of electric power and natural gas to fuel low-emission vehicles," including "compressor stations for natural gas fueled vehicles." (§ 740.3, subd. (a).) In doing so, the PUC must "ensure that utilities do not unfairly compete with nonutility enterprises" (§ 740.3, subd. (c)), and therefore all parties agree the PUC was required to find the Compression Services Tariff does not allow SoCalGas to unfairly compete with nonutility enterprises.

Clean Energy's principal line of attack is that the PUC's Decisions approving the Compression Services Tariff fail to ensure SoCalGas will not unfairly compete with nonutility enterprises in the unregulated compression services market. Specifically, Clean Energy contends the Decisions (1) allow SoCalGas to exploit its monopoly status to unfairly compete with nonutility enterprises; (2) contradict previous PUC decisions prohibiting SoCalGas from directly competing in the market to design, construct, own, and maintain compressed natural gas refueling stations on customer property; and (3) approve the Compression Services Tariff based on findings unsupported by substantial evidence in the record. We will address each of these contentions in turn.

1.      The Restrictions the Decisions Imposed Prevent Unfair Competition Based on SoCalGas's Status as a Monopoly Utility

Clean Energy contends the PUC failed to proceed in the manner required by law because its Decisions allow SoCalGas to exploit three advantages it enjoys as a monopoly natural gas utility to unfairly compete with nonutility enterprises in the unregulated compressed natural gas market. We do not find this contention persuasive because it ignores many of the findings the PUC made and also the reporting, cost tracking, and marketing restrictions the Decisions imposed on SoCalGas to prevent unfair competition.

11

The first purported advantage Clean Energy identifies is that SoCalGas has no need to expend funds or effort to generate customer leads because all customers interested in constructing compressed natural gas infrastructure likely will start their inquiries by contacting SoCalGas as the exclusive natural gas supplier within its service area. According to Clean Energy, that contact is facilitated by monthly billing statements SoCalGas sends all natural gas users with its phone number, Web address, and sometimes bill inserts discussing compressed natural gas services. Moreover, Clean Energy contends each customer seeking to install compressed natural gas infrastructure must contact SoCalGas to determine the requirements for connecting to SoCalGas's distribution system and SoCalGas must visit the customer's site to determine its particular requirements.

The second alleged advantage SoCalGas gains over its competitors is that SoCalGas has used and will continue to use customer databases and employees paid for by ordinary ratepayers to develop and market the Compression Services Tariff. In Clean Energy's view, this allows SoCalGas to unfairly subsidize its compression services with ordinary ratepayer resources. The third advantage Clean Energy identifies is that SoCalGas's status as a monopoly utility guarantees it a revenue stream that debt and equity markets view favorably and therefore significantly reduces SoCalGas's costs in accessing those markets, a benefit not enjoyed by other compression service providers. According to Clean Energy, SoCalGas will finance the equipment necessary for its compression services at a lower capital cost than its competitors.

The Decisions flatly reject the last of these three purported unfair advantages, finding "SoCalGas's low cost of capital does not give it an *unfair* competitive advantage over non-utilities providing compressed gas services." (Italics added.) The Decisions explain the cost for SoCalGas to access equity and debt markets, like other publicly traded companies, is based on SoCalGas's creditworthiness and nothing in the record supports Clean Energy's contention SoCalGas's cost of capital is

12

derived from its status as a monopoly utility provider and not other financial characteristics. As the PUC explained, it distinguished the advantages arising from monopoly regulation "from those that arise from market forces" and therefore do not provide an unfair competitive advantage. Moreover, the Decisions point out at least one significant competitor, Integrys Transportation Fuels, was able to access capital markets at a lower cost than SoCalGas, and other large companies such as Shell Oil and General Electric may enter the compression services market in California with capital costs comparable to or lower than SoCalGas's.

Clean Energy does not challenge any of these findings, but rather points to evidence showing its cost of capital is significantly higher than SoCalGas's. This one fact is not enough to overcome the substantial evidence in the record supporting the PUC's findings that SoCalGas's cost of capital does not provide it with an *unfair* advantage. (*Toward Utility Rate Normalization*, *supra*, 22 Cal.3d at pp. 537-538 [when evidence supports conflicting inferences the PUC's findings are final].) Accordingly, we reject Clean Energy's contention SoCalGas's cost of capital provides it with an unfair competitive advantage.

As for the purported advantages arising from the necessity for all potential compression services customers to contact SoCalGas and the ratepayer resources SoCalGas has, the Decisions conclude the PUC's reporting, cost tracking, and marketing restrictions eliminate any unfair competitive advantages SoCalGas might have enjoyed. Despite the Decisions' express reliance on the restrictions as the basis for its conclusion the Compression Services Tariff does not allow SoCalGas to unfairly compete, Clean Energy's amended petition challenges only the restriction requiring SoCalGas to file a semiannual report on the volume of all compression services in SoCalGas's service area and its responsiveness to customers seeking those services from other providers.

Citing *City of Los Angeles v. Public Utilities Com.* (1975) 15 Cal.3d 680 (*City of Los Angeles*), Clean Energy contends requiring future SoCalGas reports does not

13

discharge the PUC's present duty to prevent unfair competition. In *City of Los Angeles*, the PUC refused to impose annual adjustments on a utility's rates to account for future cost changes because it lacked authority to impose future rate adjustments without a hearing. (*Id*. at p. 695.) Instead, the PUC required the utility to file periodic financial reports and reserved jurisdiction to reopen the proceedings on the utility's rates based on those reports. The California Supreme Court rejected the reporting requirement because it found the PUC had authority to impose annual adjustments and reserving jurisdiction to change the utility's rates in the future did not discharge the PUC's present duty to set a reasonable rate. (*Id*. at p. 704, fn. 40.)

*City of Los Angeles* is readily distinguishable. Here, the PUC is not using the reporting requirement to avoid its present duty to prevent unfair competition. To the contrary, the PUC imposed numerous other restrictions that it found will prevent SoCalGas from unfairly competing. The PUC's reporting requirement is merely a means to monitor and enforce its restrictions. Clean Energy fails to account for the numerous other restrictions the PUC imposed and relied upon to conclude the Compression Services Tariff does not allow SoCalGas to unfairly compete.

In its reply brief, Clean Energy argues for the first time that we should annul the Decisions because the PUC failed to make findings on the effectiveness of the restrictions in preventing unfair competition and the record contains no evidence the restrictions would prevent unfair competition. Clean Energy, however, forfeited this challenge by failing to raise it in the amended petition. (See, e.g., *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1292, fn. 6 ["[a]rguments presented for the first time in an appellant's reply brief are considered waived"]; *Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1064, fn. 2 ["argument is forfeited" where "it is raised for the first time in [appellant's] reply brief without a showing of good cause"].)

14

Moreover, we reject Clean Energy's belated challenges to the restrictions on their merits. Clean Energy argues the PUC's findings on the restrictions are "classic ultimate findings" that fail to explain how the restrictions will prevent unfair competition. As an example, Clean Energy contends the findings fail to explain how filing a report will ensure SoCalGas provides equal treatment to all customers seeking compression services. Clean Energy misstates the governing standard for evaluating the PUC's findings and ignores much of the PUC's discourse on the restrictions it placed on SoCalGas.

In evaluating the adequacy of the PUC's findings, we consider the entirety of both Decisions. (*Toward Utility Rate Normalization*, *supra*, 22 Cal.3d at p. 540; *Utility Consumers' Action Network v. Public Utilities Com.* (2004) 120 Cal.App.4th 644, 661.) Clean Energy, however, faults the PUC's findings based solely on the sections in Decision No. 12-12-037 that contain the findings of fact and conclusions of law, but ignores the numerous pages of discussion in both Decisions that precede those sections and address the restrictions at length. Moreover, the governing standards did not require the PUC's Decisions to provide detailed explanations on how each restriction would prevent SoCalGas from unfairly competing; rather, the Decisions need only include statements that provide the appellate court a meaningful opportunity to ascertain the principles and facts on which the PUC relied. (*Toward Utility Rate Normalization*, at p. 540.) The Decisions did so.

For example, the Decisions acknowledge SoCalGas could unfairly compete with nonutility enterprises if it used ordinary ratepayer funds to subsidize the services it provides under the Compression Services Tariff. To prevent this, the Decisions (1) require SoCalGas to price its compression services at a level sufficient to cover all costs and risks associated with those services, and (2) prohibit SoCalGas from using any ordinary ratepayer funds to cover those costs and risks. To ensure compliance with these restrictions, the Decisions require SoCalGas to establish separate accounts to track and

15

balance all costs and risks associated with its compression services. These specific restrictions address Clean Energy's complaints about unfair competitive advantages and satisfy the PUC's findings requirement.

Clean Energy nonetheless contends the PUC's *Affiliate Transaction Rules* decision rejects using these cost accounting methods to prevent unfair competition. Decision No. 13-10-042, however, specifically addressed that argument and found the facts in the *Affiliate Transaction Rules* decision distinguishable and did not prevent the PUC from utilizing these accounting methods because the PUC imposed several additional restrictions to prevent unfair competition. As explained above, we defer to the PUC's interpretation of its own regulations and decisions when its interpretation is reasonable. (*Southern Cal. Edison*, *supra*, 85 Cal.App.4th at p. 1096.) Here, the PUC met that standard because the *Affiliate Transaction Rules* decision merely stated that cost accounting "may not be adequate" to prevent unfair competition depending on the surrounding circumstances.[5] (183 P.U.R.4th 503 [1997 Cal. PUC Lexis 1139, at p. *17].)

Accordingly, we conclude SoCalGas's status as a monopoly utility provider does not provide it with unfair competitive advantages because the PUC imposed specific restrictions on SoCalGas to prevent it from unfairly competing.

2. The PUC's Approval of the Compression Services Tariff is not Inconsistent with Prior PUC Decisions

Clean Energy contends the PUC failed to proceed in the manner required by law because the Decisions are inconsistent with four earlier decisions establishing the PUC's policies and rules on utilities participating in alternative fuel vehicle markets, and

---

[5] Clean Energy's reply brief also asserts the PUC's *Affiliate Transaction Rules* decision rejects the prohibition against billing inserts and the use of approved neutral scripts and Web site postings to prevent unfair competition. Decision 13-10-042, however, also specifically finds that decision did not prevent the use of those restrictions to eliminate unfair competition in this case.

16

the Decisions fail to make findings to justify their inconsistencies with those earlier precedents.  We disagree.

The first PUC decision on which Clean Energy relies is the *Phase II LEV Guidelines* decision.  Clean Energy contends that decision bars SoCalGas from owning natural gas vehicle refueling stations on customer property and from otherwise unfairly competing with any nonutility enterprise that builds or operates refueling stations.  This misconstrues the *Phase II LEV Guidelines* decision and ignores the Decisions' findings concerning that decision.

The *Phase II LEV Guidelines* decision was the second of two PUC decisions addressing the role of regulated utilities in developing the infrastructure necessary to support both natural gas vehicles and electric vehicles.  (165 P.U.R.4th 503 [1995 Cal. PUC Lexis 978, at p. *1].)  The decision approved the continued use of ratepayer funds for certain low-emission vehicle programs, but denied SoCalGas's request to build and operate retail refueling stations on customer property using ratepayer funds.[6]  (165 P.U.R.4th 503 [1995 Cal. PUC Lexis 978, at pp. *2, *115-*116].)  Because the PUC found many companies were interested in constructing and operating refueling stations, the *Phase II LEV Guidelines* decision prohibited SoCalGas and other utilities from using ratepayer funds to construct retail refueling stations and thereby place ratepayers at risk for the commercial viability of those stations.  The *Phase II LEV Guidelines* decision, however, did not generally prohibit utilities from constructing or owning refueling stations, but rather established that any future program for refueling stations must not give the utility a market advantage or place the program's risk on ratepayers.  (165 P.U.R.4th 503 [1995 Cal. PUC Lexis 978, at pp. *123-*124].)  Although the *Phase II LEV Guidelines* decision concluded it was inappropriate for

---

[6]     The *Phase II LEV Guidelines* decision also denied SoCalGas's request to pass on to ratepayers any losses it suffered from the sale of the stations it already had built.  (165 P.U.R.4th 503 [1995 Cal. PUC Lexis at p. *124].)

17

utilities to own and operate retail refueling stations using ratepayer funds, the decision concluded it would be appropriate for utilities to do so using shareholder funds. (165 P.U.R.4th 503 [1995 Cal. PUC Lexis 978, at pp.*16-*17, *124].)

The PUC found the Compression Services Tariff is not inconsistent with the *Phase II LEV Guidelines* decision because the tariff does not authorize SoCalGas to build and operate retail refueling stations using ratepayer funds. Instead, the Compression Services Tariff allows SoCalGas to build and maintain refueling stations and other compression facilities at a customer's request provided the customers under the Compression Services Tariff bear all the costs and risks associated with the station or facility. Moreover, as described above, the Compression Services Tariff imposes numerous restrictions on SoCalGas's compression services to ensure it does not unfairly compete with nonutility enterprises. Clean Energy does not challenge the PUC's findings that the *Phase II LEV Guidelines* decision did not apply to the Compression Services Tariff. Moreover, we must defer to the PUC's interpretation of its own decision because the interpretation is reasonable and consistent with the decision's rationale. (*Southern Cal. Edison*, *supra*, 85 Cal.App.4th at p. 1096.)

Clean Energy also relies on the *Affiliate Transaction Rules* decision. Clean Energy contends this decision requires SoCalGas to provide new services like those described in the Compression Services Tariff through an unregulated affiliate that does not share resources with SoCalGas, does not unfairly compete with nonutility enterprises providing similar services, and does not use ratepayer resources. Clean Energy again misconstrues the *Affiliate Transaction Rules* decision and ignores the PUC's findings distinguishing that decision.

The *Affiliate Transaction Rules* decision acknowledges many utilities provide new products and services through unregulated affiliates. To monitor this development, the decision established standards to maintain separation between utilities and their unregulated affiliates and thereby ensure the affiliates do not use the utilities'

18

market power to unfairly compete with nonutility enterprises. (183 P.U.R.4th 503 [1997 Cal. PUC Lexis 1139, at pp. *15-*17].) The *Affiliate Transaction Rules* decision, however, authorizes utilities to offer "[u]nbundled versions of existing utilities products and services, with the unbundled versions being offered on a tariffed basis," and "[n]ew products and services that are offered on a tariffed basis." In those situations, an unregulated affiliate is not required. (183 P.U.R.4th 503 [1997 Cal. PUC Lexis 1139, at p. *214].)

The PUC found the *Affiliate Transaction Rules* decision does not require SoCalGas to offer the services described in the Compression Services Tariff through an unregulated affiliate because those services are either an unbundled version of the compression services SoCalGas already offers under its Tariff Rule No. 2 or a new product or service SoCalGas will offer on a tariffed basis. The record supports these findings. As explained above, SoCalGas's Tariff Rule No. 2 already allows SoCalGas to construct, own, and maintain special facilities on customer property to provide natural gas at nonstandard pressure agreed upon by the customer and SoCalGas. The compression services the Compression Services Tariff authorizes are a version of those same services and will be provided on a tariffed basis. Assuming the services offered under the Compression Services Tariff are new services, they still fall under the exceptions to the *Affiliated Tariff Rules* decision described above because they will be offered on a tariffed basis. Moreover, we must defer to SoCalGas's interpretation of its *Affiliate Transaction Rules* decision because its interpretation is reasonable based on the language quoted above. (*Southern Cal. Edison*, *supra*, 85 Cal.App.4th at p. 1096.)

Clean Energy contends the Compression Services Tariff is not a true tariff because it fails to set a specific rate or charge for compression services, and therefore the exceptions to the *Affiliated Transaction Rules* decision for certain services offered on a tariffed basis do not apply. True, the Compression Services Tariff does not set a specific rate or charge for its services, but it requires SoCalGas to "use well established

19

methodologies identical to those used in general rate cases, to set the price of this service" and to negotiate the specific price with each customer based on "cost and rate components, adjustments, performance requirements and payment terms" required by the specific compression services the customer requests. The Compression Services Tariff also requires "the tariff customer [to] bear[] the cost of the services received." Tariff Rule No. 2 does not set a specific rate or charge for the compression services it authorizes, but none of the parties contend those services are not properly offered on a tariffed basis. Moreover, Clean Energy fails to cite any authority requiring a specific rate or charge for services to be offered on a tariffed basis. We therefore reject this contention.

The third and fourth decisions on which Clean Energy relies are the *Phase I LEV Guidelines* decision and the *Electric Vehicle Policies* decision. Clean Energy does not contend these decisions establish any specific rules that prohibit SoCalGas from offering the services described in the Compression Services Tariff. Instead, Clean Energy merely contends these decisions prohibit SoCalGas from unfairly competing with any nonutility enterprise. As explained above, the PUC imposed numerous restrictions on the Compression Services Tariff to prevent SoCalGas from unfairly competing with nonutility enterprises. Consequently, Clean Energy's challenge to the Compression Services Tariff based on any purported inconsistencies with these decisions fails.[7]

---

[7] Clean Energy suggests SoCalGas may not own refueling equipment on a customer's property because the *Electric Vehicles Policies* decision denied the request of electric utilities to own electric vehicle recharging stations on customer property. The Decisions found the *Electric Vehicle Policies* decision only applies to electric vehicle refueling stations, not natural gas refueling stations, and an analogy cannot be drawn between the two. Clean Energy does not challenge this finding.

3.      Substantial Evidence Supports the PUC's Findings on Unfair Competition

Clean Energy challenges the sufficiency of the evidence to support two of the PUC's findings concerning unfair competition. In finding No. 9, the PUC concluded, "SoCalGas's low cost of capital does not give it an unfair competitive advantage over non-utilities providing compressed gas services." Clean Energy contends the record lacks substantial evidence to support this finding because the evidence shows SoCalGas's status as a monopoly utility provider allows it to borrow money and raise capital at a substantially lower rate than its nonutility competitors. According to Clean Energy, it costs SoCalGas less to access the debt and equity markets because its nearly six million captive ratepayers provide it with a guaranteed revenue stream and the PUC is required to set SoCalGas's rates at a level that guarantees a stable rate of return. Based on our review of the record, substantial evidence supports the PUC's finding.

As explained above, the record reveals numerous factors determine SoCalGas's capital costs other than its status as a monopoly utility, and SoCalGas's monopoly status does not guarantee it lower capital costs than nonutility competitors. Although the record shows SoCalGas's cost of capital is lower than Clean Energy's, that is not an unfair advantage that arises from SoCalGas's monopoly status because the record also shows that at least one nonutility competitor, Integrys Transportation Fuels, has a capital cost lower than SoCalGas's and other large companies are considering entering California's compression services market with capital costs comparable to or lower than SoCalGas's. This constitutes substantial evidence supporting the PUC's finding No. 9. (See *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 222 Cal.App.4th 149, 159 ["'The term "substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value'"].)

Clean Energy also challenges finding No. 16, which states, "SoCalGas's access to customer information does not provide it with unfair competitive advantage in

21

the provision of compressed gas services because the customer information does not provide information on who would desire compressed gas services." Clean Energy contends "uncontroverted evidence establishes that *every* potential [compressed natural gas] infrastructure customer must and will contact SoCalGas: [I]t is that customer-initiated contact and the detailed, targeted, customer information that results about who is shopping for [compressed natural gas] infrastructure services, what their specific needs are, and what their history is, that confers an unfair advantage." (Original italics.) According to Clean Energy, this "uncontroverted evidence" prevents the PUC from finding SoCalGas's access to customer information does not provide it with an unfair competitive advantage. We disagree.

Clean Energy's challenge to finding No. 16 misconstrues the nature of that finding. The finding simply states SoCalGas's access to information about its ratepayers does not provide SoCalGas with an unfair advantage because that information does not reveal which customers are considering compressed gas services. Clean Energy does not challenge that specific finding or the evidentiary support for it. Instead, Clean Energy's challenge focuses on different customer information — the information SoCalGas receives when a customer contacts SoCalGas as the monopoly gas supplier to inquire about compressed gas services and how to connect the customer's infrastructure to SoCalGas's distribution system.

The Decisions acknowledge SoCalGas's status as monopoly gas supplier makes it a logical contact for customers interested in compressed gas services and therefore may provide SoCalGas an unfair competitive advantage. As explained above, however, the PUC found they eliminated this unfair advantage by imposing numerous reporting, cost tracking, and marketing restrictions on SoCalGas, and Clean Energy does not challenge that finding or the evidentiary support for it. Accordingly, we reject Clean Energy's challenge to finding No. 16.

22

C.  *The PUC Made Adequate Findings on the Affiliate Option*

Clean Energy contends the PUC failed to proceed in the manner required by law and abused its discretion by rejecting Clean Energy's Affiliate Option without "includ[ing] in its findings and conclusions the basis for its rejection of [the Affiliate Option as an] alternative[] to the proposal under consideration."  The Decisions, however, include adequate findings and conclusions explaining the PUC's basis for rejecting the Affiliate Option.

Nothing in the Public Utilities Code specifically required the PUC to make findings on alternatives to the Compression Services Tariff.  Instead, section 1705 required the Decisions to "contain, separately stated, findings of fact and conclusions of law by the [PUC] *on all issues material to the . . .* [*D*]*ecision*[*s*]."  (§ 1705, italics added.) It is within the PUC's discretion to determine what factors are material to its decision based on the issues before it.  Section 1705 merely "requires [the PUC] to state what those factors are and to make findings on the material issues that ensue therefrom." (*California Motor Transport Co. v. Public Utilities Com.* (1963) 59 Cal.2d 270, 275 (*California Motor Transport*).)  Indeed, the PUC's findings and conclusions are sufficient if they provide "a statement which will allow us a meaningful opportunity to ascertain the principles and facts relied upon by the [PUC] in reaching its decision." (*Toward Utility Rate Normalization*, *supra*, 22 Cal.3d at p. 540.)  In other words, "a complete summary of all proceedings and evidence leading to the decision" is not required.  (*Ibid*.)

Here, the Decisions satisfy these standards.  They repeatedly explain the PUC considered and rejected Clean Energy's Affiliate Option because the numerous restrictions the Compression Services Tariff imposed already prevented SoCalGas from unfairly competing with nonutility enterprises in the compression services marketplace. For example, the Decisions found, "we considered the [A]ffiliate [O]ption and determined that creation of an affiliate was unnecessary for ensuring a fair competitive marketplace. . . .  [¶]  . . .  [¶]  With the[] adopted ratepayer protections and rules to

23

ensure fair competition, it is not necessary for us to require SoCalGas to offer the compression service[s] through an affiliate as the CST is consistent with the law and the public interest." Moreover, as explained above, the PUC also found the decision in *Affiliate Transaction Rules* on which Clean Energy based the Affiliate Option did not apply because the Compression Services Tariff authorizes a version of a service SoCalGas already provides, or at a minimum a new service offered on a tariffed basis.

Implicitly acknowledging the Public Utilities Code does not address project alternatives, Clean Energy relies on three Supreme Court cases to argue the PUC's Decisions not only had to explain the basis for rejecting the Affiliate Option but also include findings on the relative merits of that option in comparison to the Compression Services Tariff. (See *United States Steel Corp. v. Public Utilities Com.* (1981) 29 Cal.3d 603 (*U.S. Steel*); *California Manufacturers Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 251 (*California Manufacturers*); *City of Los Angeles*, *supra*, 15 Cal.3d 680.) We do not find that contention persuasive because none of the cases Clean Energy cited imposed such a requirement. [8]

---

[8] In contrast to the Public Utilities Act (§ 201 et seq.), the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and its implementing regulations (Cal. Code Regs., tit. 14, § 15000 et seq.) include detailed provisions requiring environmental impact reports to identify and analyze the comparative merits of alternatives to the proposed project (Pub. Resources Code, §§ 21002.1, subd. (a); 21100, subd. (b); Cal. Code Regs., tit. 14, § 15126.6(a) & (d)), and the public agency to make specific findings rejecting the project alternatives it did not adopt (Pub. Resources Code, § 21081, subd. (a)(3); Cal Code Regs., tit. 14, § 15091(a)(3) & (c)). Interestingly, CEQA and its regulations do not require a public agency to make findings rejecting alternatives if the environmental impacts of the approved project will be avoided or substantially lessened through mitigation measures. (Pub. Resources Code, § 21081, subd. (a); Cal Code Regs., tit. 14, § 15091(a); *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 379 ["CEQA does not require the responsible agency to consider the feasibility of environmentally superior project alternatives identified in the EIR if described mitigation measures will reduce environmental impacts to acceptable levels"]; *Laurel Hill Homeowners Assn. v. City Council* (1978) 83 Cal.App.3d 515, 521.)

24

In *U.S. Steel*, the PUC approved an exemption for some motor carriers from minimum rates it established for the transportation of certain commodities. (*U.S. Steel*, *supra*, 29 Cal.3d at p. 607.) The Supreme Court annulled that decision because the PUC refused to consider the economic effect of authorizing different rates for similar services over similar routes. (*Id*. at pp. 608-610.) In *California Manufacturers*, the PUC approved a method for allocating a rate increase among different types of natural gas customers based on its finding the selected alternative provided greater conservation of natural gas than other proposed alternatives. (*California Manufacturers*, *supra*, 24 Cal.3d at pp. 254-255.) The Supreme Court annulled that decision because neither the PUC's findings nor the evidence showed the selected method would conserve more natural gas than the other proposed methods. (*Id*. at pp. 259-260.) Finally, in *City of Los Angeles*, the PUC approved a utility's rate increase, but declined to consider annual adjustments to that rate because it interpreted the governing statutes as prohibiting a rate adjustment without a hearing. (*City of Los Angeles*, *supra*, 15 Cal.3d at p. 684.) The Supreme Court annulled the decision because the statutes allowed the PUC to impose annual adjustments without a hearing and therefore the PUC should have considered whether to impose the proposed adjustments. (*Id*. at pp. 694-695, 704.)

In each case, the Supreme Court annulled the PUC's decision because the PUC either erroneously *refused* to consider an alternative or relevant factor in reaching its decision (*U.S. Steel*, *supra*, 29 Cal.3d at pp. 609-610; *City of Los Angeles*, *supra*, 15 Cal.3d at p. 704) or based its decision on a factor for which there were no findings or evidence (*California Manufacturers*, *supra*, 24 Cal.3d at pp. 259-260). *California Manufacturers* is the only case that faulted the PUC for failing to make findings on the relative merits of proposed alternatives, but it did so because the PUC expressly based its decision on the selected alternative conserving more natural gas than the other alternatives. (*Ibid*.) Accordingly, these cases may be construed to require the PUC to consider and address project alternatives that come to light during the administrative

25

process, but none of them require the PUC to make findings comparing the relative merits of project alternatives in every case.

The *U.S. Steel* and *City of Los Angeles* decisions do not apply here because the PUC did not refuse to consider the Affiliate Option.[9]  Similarly, *California Manufacturers* does not apply because the PUC did not reject the Affiliate Option based on a comparison of whether the Affiliate Option or the Compression Services Tariff would do a better job of preventing unfair competition.  Here, the PUC considered the Affiliate Option and found it was superfluous because the restrictions the PUC imposed on SoCalGas already prevented it from unfairly competing.  Indeed, the PUC faced the Affiliate Option head on and determined the public interest did not require SoCalGas to provide the proposed services through an unregulated affiliate because the restrictions the PUC imposed already prevented SoCalGas from unfairly competing.  Nothing in *U.S. Steel*, *City of Los Angeles*, or *California Manufacturing* required the PUC to make findings on the relative merits of an alternative proposed to eliminate possible competitive advantages the PUC found it already had eliminated through other restrictions.

Had the PUC rejected the Affiliate Option because it found the restrictions were more effective in preventing unfair competition, the *California Manufacturers* decision would have required the PUC to make findings on the relative merits and abilities of the two alternatives to prevent unfair competition.  In that scenario, the grounds for rejecting the Affiliate Option would make the relative merits a material issue

_____

9       *Northern California Power Agency v. Public Utilities Com.* (1971) 5 Cal.3d 370, and *City & County of San Francisco v. Public Utilities Com.* (1971) 6 Cal.3d 119, also do not apply for the same reason.  Clean Energy cites both cases without discussing the facts of either one.  In both cases, the Supreme Court annulled PUC decisions because the PUC refused to consider specific alternatives or factors in reaching its decision. (*Northern California Power Agency*, at pp. 376, 379; *City & County of San Francisco*, at pp. 126, 130.)  These cases are distinguishable because here the PUC considered Clean Energy's proposed alternative.

requiring findings under section 1705. The PUC, however, rejected the Affiliate Option as unnecessary because the restrictions imposed on SoCalGas already prevented unfair competition. That determination made the effectiveness of those restrictions the material issue, and the PUC's findings properly addressed that issue. As explained above, it is within the PUC's discretion to determine what factors are material to its decision (*California Motor Transport*, *supra*, 59 Cal.2d at p. 275), and Clean Energy failed to show the PUC abused its discretion. It may be preferable from a policy perspective to require the PUC to compare alternatives, but that policy determination is not for us to decide. Neither the Public Utilities Code nor the applicable case law required the PUC to make findings on the relative merits of the Affiliate Option based on the facts presented.

Moreover, we are mindful the PUC also found the *Affiliate Transaction Rules* decision does not apply to SoCalGas's proposal to provide compression services under the Compression Services Tariff because those services are merely a version of a service SoCalGas already provides, or at a minimum a new service offered on a tariffed basis. Clean Energy essentially claims the PUC must make findings on the relative merits of an alternative no longer relevant to the proposal at issue and unnecessary to prevent the harm — unfair competition — the alternative was purportedly intended to prevent. Clean Energy cites no authority imposing such a duty.

D.    *The Record Supports the PUC's Findings the Compression Services Tariff Will Benefit the Environment*

To support its approval of the Compression Services Tariff, the PUC found the tariff will lead to an incremental expansion of natural gas use in the Los Angeles area and thereby reduce air pollution and greenhouse gas emissions because compressed natural gas vehicles produce fewer emissions than traditional petroleum based fuels. Clean Energy does not dispute the PUC's conclusion increased natural gas use would produce environmental benefits. Instead, Clean Energy challenges the sufficiency of the

27

evidence to support the PUC's finding the Compression Services Tariff will lead to an increase in natural gas use. Substantial evidence supports the PUC's finding.

The evidence shows that (1) the compressed natural gas market in SoCalGas's service area is highly concentrated with Clean Energy and Integrys Transportation Fuels serving 82 percent of the market by volume; (2) growth in the use of natural gas as a transportation fuel is well behind the state's projections, having grown only 4.7 percent per year between 2006 and 2010 while the state projected conservative annual growth at 6.5 percent and moderate growth at 12.9 percent; (3) natural gas accounts for less than one percent of all transportation fuel in California; (4) the state has established aggressive goals for reducing greenhouse gas emissions (Health & Safety Code, § 38500 et seq.); (5) the Compression Services Tariff offers a new form of compression services not currently available in the market that is priced in a transparent manner because it is offered on a tariffed basis; and (6) 77 percent of the participants in a survey of existing customers using compression services and those who have expressed an interest in those services reported the Compression Services Tariff would make them more likely to undertake a new compressed natural gas project or enhance an existing project.

At a minimum, the foregoing evidence supports the reasonable inference that allowing SoCalGas to offer the services described in the Compression Services Tariff will increase competition and expand customer choice in the compressed natural gas market, and thereby increase growth in the demand for compression services. (*Meyers v. Board of Administration, etc.* (2014) 224 Cal.App.4th 250, 256 [under the substantial evidence standard, we must resolve all conflicts and indulge all reasonable inferences in favor of the underlying decision]; *County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 72-73 [substantial evidence includes not only direct evidence, but also circumstantial or indirect evidence and all reasonable inferences flowing therefrom]; *Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487.)

28

Clean Energy contends nothing in the record supports the conclusion the customers SoCalGas will serve under the Compression Services Tariff are new compressed natural gas customers who otherwise would not have entered the market or increased their demand for compressed natural gas. According to Clean Energy, the PUC was required to make findings demonstrating the Compression Services Tariff will attract new customers rather than customers taken from other market participants. We disagree. As explained above, the PUC was not required to make the sort of detailed findings Clean Energy demands. Instead, it merely had to provide a statement that allows an appellate court to ascertain the principles and facts on which it relied. (*Toward Utility Rate Normalization*, *supra*, 22 Cal.3d at p. 540.) The PUC's findings regarding the compressed natural gas market and the impact of the Compression Services Tariff on that market meet that standard.

Finally, Clean Energy contends the PUC should not have used the volume of compressed natural gas sold to measure its market share. According to Clean Energy, its market share is irrelevant and should have been measured by the number of refueling stations it owns, not the volume of gas put through to stations it owns or services. We again disagree. The PUC's goal in adopting the Compression Services Tariff is to increase the volume of compressed natural gas used and thereby reduce the use of traditional petroleum fuels. Although the number of refueling stations impacts the volume used, there was nothing improper about the PUC relying on the volume of gas to measure market share. Moreover, market share is a relevant consideration because it shows the concentration of the market and whether it will benefit from additional competition. (See *California Motor Transport*, *supra*, 59 Cal.2d at p. 275 [PUC vested with discretion to determine factors relevant to its ultimate findings].)

## III

### DISPOSITION

The Decisions are affirmed.  The PUC and SoCalGas shall recover their costs.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CLEAN ENERGY FUELS CORP., | |
| Petitioner, | G048820 |
| v. | (Super. Ct. No. CPUC Nos. D.12-12-037 & D.13-10-042) |
| CALIFORNIA PUBLIC UTILITIES COMMISSION, | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Respondent, | |
| SOUTHERN CALIFORNIA GAS COMPANY, | |
| Real Party in Interest. | |

The opinion filed on May 29, 2014, is modified as follows:

1. On page 18, in the first full paragraph, at the end of the third full sentence, remove the period and the first word of the next sentence, "Moreover," and replace them with a comma and the word "and" so it reads "Clean Energy does not challenge the PUC's findings that the *Phase II LEV Guidelines* decision did not apply to the Compression Services Tariff, and we must defer to the PUC's interpretation of its own decision because the interpretation is reasonable and consistent with the decision's rationale. (*Southern Cal. Edison*, *supra*, 85 Cal.App.4th at p. 1096.)"

31

2.    On page 19, in the last sentence of the only full paragraph on the page, "we must defer to SoCalGas's interpretation" should be changed to "we must defer to the PUC's interpretation."

3.    On page 24, in the second line, "CST" should be replaced with "C[ompression] S[ervices] T[ariff]."

This modification does not change the judgment.

The California Public Utilities Commission has requested that our opinion, filed on May 29, 2014, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.


                                        ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.