Filed 2/3/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOUTHERN CALIFORNIA GAS COMPANY,<br><br>        Petitioner,<br><br>    v.<br><br>PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA,<br><br>        Respondent. | B310811<br><br>Commission Decision No. D.21-03-001 & Resolution ALJ-391<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 6, 2023, be modified as follows:

1.  On page 3, the first full paragraph, the phrase "In 1996, the Legislature created a division within the Commission, later naming it the Public Advocate's Office" is changed to:

In 1985, the Legislature authorized the creation of a division within the Commission, later named the Public Advocate's Office.

2. On page 5, the first full sentence is changed from "The discovery inquiry, conducted outside any formal proceeding, comprised three data requests and one subpoena" to:

The discovery inquiry, conducted outside any formal proceeding, comprised more than a dozen data requests. We will focus on three data requests and one subpoena.

3. On page 5, the second full paragraph, the phrase "did not use shareholder contributions" is changed to "did not use ratepayer contributions" so the sentence reads:

The point of SCG's production was to show that it did not use ratepayer contributions to fund astroturf groups.

4. On page 5, the third full paragraph is changed to:

However, SCG redacted a name or signature from its response, and the Work Order Authorization itself indicated the work *was* billed to a ratepayer-funded account (Federal Energy Regulatory Commission (FERC) account 920.0). (SCG later claimed this was an accounting error, which it corrected to FERC 426.4.) The PAO moved the Commission's administrative law judge (ALJ) to compel a further response, which the ALJ granted.

5.  On page 16, the penultimate paragraph is changed to the following:

> As noted, in 1985 the Legislature authorized creation of the PAO's predecessor, the ultimate purpose of which was "to represent and advocate on behalf of the interests of public utility customers and subscribers within the jurisdiction of the commission."  (Stats. 2018, ch. 51, § 39.)

> These modifications effect no change in the judgment.

> The Public Utilities Commission's petition for rehearing is denied.

_____

ROTHSCHILD, P. J.       CHANEY, J.           BENDIX, J.

3

Filed 1/6/23 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOUTHERN CALIFORNIA GAS COMPANY,<br><br>  Petitioner,<br><br>  v.<br><br>PUBLIC UTILITIES COMMISSION,<br><br>  Respondent. | B310811<br><br>Commission Decision No. D.21-03-001 & Resolution ALJ-391 |

ORIGINAL PROCEEDING; review of Decision No. D.21-03-001 and Resolution ALJ-391 of the Public Utilities Commission of the State of California.  Petition for writ of mandate granted.

Gibson, Dunn & Crutcher, Julian W. Poon, Michael H. Dore, Andrew T. Brown, Daniel M. Rubin and Matthew N. Ball for Petitioner.

John A. Pacheco for San Diego Gas & Electric Company as Amicus Curiae on behalf of Petitioner.

Arocles Aguilar, Mary McKenzie, Christine Hammond, Dale Holzschuh, Carrie G. Pratt and Edward Moldavsky for Respondent.

Earthjustice, Matthew Vespa, Rebecca Barker and Sara Gersen for Sierra Club as Amicus Curiae on behalf of Respondent.

Jerry Flanagan and Scott L. Nelson for Public Citizen and Consumer Watchdog as Amici Curiae on behalf of Respondent.

_____

These original proceedings involve efforts by the Public Utilities Commission (PUC or the Commission) to discover whether the political activities of Southern California Gas Company (SCG) are funded by SCG's shareholders, which is permissible, or ratepayers, which is not. The Commission propounded several discovery requests (called "Data Requests") on SCG, and when SCG failed fully to comply, moved to compel further responses that ultimately resulted in an order to comply or face substantial penalties. SCG seeks a writ of mandate directing the Commission to rescind its order on the ground that the discovery requests infringe on SCG's First Amendment rights.

We grant the petition. SCG has shown that disclosure of the requested information will impact its First Amendment rights, and the Commission failed to show that its interest in determining whether SCG's political efforts are impermissibly funded outweighs that impact.

## BACKGROUND

The California Constitution authorizes the Legislature to exercise control over companies delivering heat or power to the public, and authorizes the PUC to "establish rules, examine records, issue subpoenas, . . . take testimony, punish for

2

contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction." (Cal. Const., art. XII, § 6.)

In 1996, the Legislature created a division within the Commission, later naming it the Public Advocate's Office (PAO, the Office, or CalAdvocates), "to represent and advocate on behalf of the interests of public utility customers and subscribers within the jurisdiction of the commission." (Stats. 2018, ch. 51, § 39.) The PAO's goal is "to obtain the lowest possible rate for service consistent with reliable and safe service levels." (Pub. Util. Code, § 309.5, subd. (a).)[1]

To serve this goal, the PAO is authorized to "compel the production or disclosure of any information it deems necessary to perform its duties from any entity regulated by the commission." (§ 309.5, subd. (e).) Any objection to a PAO request for production is adjudicated by the PUC. (*Ibid.*)

SCG, an investor-owned utility that provides natural gas to the public in several Southern California counties, is subject to Commission regulation and PAO discovery inquiries.

As an investor-owned utility, SCG differentiates between "ratepayer funds" ("above-the-line accounts") and "shareholder funds" ("below-the-line accounts"). Activities or contracts are preliminarily booked to an above-the-line or below-the-line account, with the final ratemaking decision settled at a "general rate case" proceeding (GRC). At a GRC, SCG generally seeks cost recovery from ratepayers only for expenditures in its above-the-line accounts. Expenditures in SCG's below-the-line accounts

---

[1] Undesignated statutory references will be to the Public Utilities Code.

(i.e., shareholder-funded accounts) are not recovered from ratepayers.  In this manner, SCG may use its 100 percent-shareholder-funded accounts to, among other things, advocate for natural gas, renewable gas, and other clean-fuel (e.g., hydrogen) solutions.

## A.    PAO Discovery Inquiry

### 1.    Rulemaking 19-01-011 proceeding

On January 31, 2019, the PUC initiated an unrelated proceeding, designated "Rulemaking 19-01-011," regarding building decarbonization.  In that proceeding, an association known as Californians for Balanced Energy Solutions (C4BES), which presents itself as "a coalition of natural and renewable natural gas users," moved to obtain party status.[2]  The Sierra Club opposed the motion, alleging that C4BES was actually an "astroturfing" group founded and funded by SCG.[3]

### 2.    Discovery requests before the ALJ

As a result of the Sierra Club's allegation in Rulemaking 19-01-011 that C4BES was an astroturfing group funded by SCG, the PAO undertook to investigate the allegation, and in May 2019, initiated a discovery inquiry into the extent to which SCG used ratepayer funds to support putative grassroots organizations advocating for SCG's anti-decarbonization

---

[2] Available at: https://www.publicadvocates.cpuc.ca.gov/general.aspx?id=4444.

[3] Astroturfing is a practice in which corporate sponsors of a message mask their identity by establishing separate organizations to state a position or make it appear as though the movement originates from and has grassroots support.

positions.  The discovery inquiry, conducted outside any formal proceeding, comprised three data requests and one subpoena.

### a. July 2019 Data Request

On July 19, 2019, the PAO issued a data request to SCG, Request No. "CalAdvocates-SC-SCG-2019-04," concerning the financing of SCG's activities.[4]

SCG responded by producing a Work Order Authorization, which in turn contained a Balanced Energy Internal Order which accounted for shareholder contributions to fund the work order. The point of SCG's production was to show that it did not use shareholder contributions to fund astroturf groups.

However, SCG redacted from its response shareholder dollar figures from the Balanced Energy Internal Order, and objected to their production as nonresponsive to the PAO's request and unnecessary to the discharge of its duties.  The PAO moved the Commission's administrative law judge (ALJ) to compel further responses containing an unredacted Work Order Authorization, which the ALJ granted.

### b. August 2019 Data Request

On August 13, 2019, the PAO served SCG with a request for all contracts covered by the Work Order Authorization, Request No. "CalAdvocates-SC-SCG-2019-05."  In response, SCG produced contracts funded jointly by ratepayers and shareholders, but objected to producing C4BES-related contracts funded solely by shareholders on the ground that to produce them

---

[4] To reiterate, the PAO issued this data request outside of the R.19-01-011 proceeding, as the scope of that proceeding was limited to building decarbonization matters.

5

would violate its rights of free speech and association. The PAO moved the ALJ to compel further responses.

### (1) ALJ November 1, 2019 Ruling

On November 1, 2019, the ALJ granted the PAO's motion to compel further responses to the August 13 request, ordered SCG to produce requested documents within two business days, and denied SCG's request for a two-week stay to afford it an opportunity to appeal the ruling.[5]

### (2) SCG November 1, 2019 Motion to Stay

On November 1, 2019, SCG moved to reconsider and stay enforcement these rulings.

## c. May 2020 Data Requests and Subpoena

### (1) May 1 Request

On May 1, 2020, as part of its continuing inquiry into SCG's use of ratepayer monies to fund an anti-decarbonization campaign through astroturf organizations, the PAO served Request No. "CalAdvocates-TB-SCG-2020-03" on SCG, seeking remote access to SCG's System Applications & Products accounting system. This accounting system is a large database that includes sensitive financial and nonfinancial material related to SCG's transactions, including vendor invoices, third-party payments, workers-compensation payments, employee reimbursements, and other attachments relating to approximately 2,000 vendors and other parties. The PAO's

---

[5] The ALJ assigned by the Commission to handle the matter notified the parties of certain procedural rules to follow since this discovery dispute was outside of any formal proceeding in which the Commission's Rules of Practice and Procedure (Title 20, Division 1, of the California Code of Regulations) (herein "Rules") would directly apply.

request included a request for "information regarding all contracts, invoices, and payments made to third parties," and a request to train and assist a PAO auditor to access SCG's accounts.

(2) Subpoena

On May 5, 2020, the PAO served a subpoena on SCG, commanding the utility to provide PAO "staff and consultants" with the same information as set forth in Request No. CalAdvocates-TB-SCG-2020-03, including "access to all databases associated in any manner with the company's accounting systems," and "both on-site and remote access . . . at the times and locations requested by [PAO]," "no later than three business days after service," i.e., by May 8. The focus was on determining, for example, what accounts were used to track shareholder-funded activity, what payments are made from those accounts, and what invoices were submitted in support of those payments. The subpoena was supported with a PAO declaration that SCG's "responses to data requests in the investigation have been incomplete and untimely."

(3) May 8 Request

On May 8, 2020, the PAO demanded the production of data contained in SCG's accounting system for all "100% shareholder funded" accounts that "house[] costs for activities related to influencing public opinion on decarbonization policies," and "for lobbying activities related to decarbonization policies" (the May 8 data request).

SCG responded by proposing that "access to attachments and invoices [in the accounting system] would be shut off [by default] but could be requested by [PAO's] auditor," at which time "[a]n attorney would then be able to quickly review requested

7

invoices and provide nonprivileged . . . materials to the auditor." The PAO rejected SCG's proposal.

SCG also offered to provide access to approximately 96 percent of the information related to its accounts—shielding only constitutionally protected and/or privileged material—provided that the PAO agreed to a non-disclosure agreement or confidentiality protocol. The PAO rejected this offer as well.

On May 18, 2020, SCG produced fixed copies of two years' worth of its accounting data (2016-2017) for accounts specifically identified by the PAO.

**B.   Proceedings before the Full Commission**

**1.   December 2, 2019 and May 22, 2020 SCG Motion for Reconsideration/Appeal and Motion to File Declarations Under Seal**

On December 2, 2019, SCG appealed from and moved the full Commission to reconsider the ALJ's November 1, 2019 ruling. On May 22, 2020, SCG supplemented this motion with (1) a separate motion, and (2) a motion to file certain declarations under seal.

SCG observed that the PAO's discovery inquiry is not itself a formal proceeding, and requested that the inquiry be brought within a formal proceeding by issuance of a Commission Order Instituting Rulemaking or Order Instituting Investigation, which SCG argued would provide more transparency and ensure due process. The PAO opposed this request.

In its motion for reconsideration, SCG argued that the Commission's interest in obtaining information about SCG's political activities and activities that are "100% shareholder-

8

funded" was not compelling because such activities are not subject to Cal Advocates' oversight.

SCG further argued that disclosure of information about political activities and activities that were "100% shareholder funded" would infringe on SCG's First Amendment rights.

In support of the motion, Sharon Tomkins, SCG's Vice President of Strategy and Engagement and Chief Environmental Officer, declared, "If the non-public contracts and communications [SCG] has had regarding its political activity to advance natural gas are required to be disclosed in response to the demands of the [PAO], it will alter how [SCG] and its partners, consultants, and others work together and communicate in the future regarding matters of shared political interest." Tompkins declared that SCG's production to date had already "had a chilling effect on [SCG] and [its] ability to engage in activities which are lawful."

Tompkins declared that her work includes "sensitive discussions in furtherance of developing strategy and advocacy associated with natural gas solutions and selecting [SCG's] message and the best means to promote that message. It also has included recommending that others become involved with [SCG] in this political process." She declared that further disclosures to the PAO "will have a chilling effect" on those communications and "could limit [SCG's] future associations" because she and SCG "will need to take into consideration the

9

potential disclosure of such communication in the future as a result of such forced [discovery] disclosure."

Tompkins declared that "Based on conversations [she] had, others may be less likely to associate with [SCG]" if information about its political efforts were disclosed to the Commission.

In further support of its motion for reconsideration, SCG submitted three declarations from private organizations specializing in government relations and public affairs, including statements that disclosure of shareholder information to the Commission would dissuade them from communicating or contracting with SCG.

### 2. May 22, 2020 SCG Motion to Quash or Stay the May 5 Subpoena

Also on May 22, 2020, SCG moved to quash or stay portions of the PAO's May 5, 2020 subpoena to allow SCG an opportunity to implement software solutions to exclude what it deemed to be materials protected by attorney-client and attorney work product privileges, as well as materials implicating First Amendment issues.

### 3. June 23, 2020 PAO Motion for Contempt and Monetary Sanctions

On June 23, 2020, the PAO moved the Commission to find SCG in contempt.

### 4. July 9, 2020 PAO Motion to Compel and Request for Assessment of Fines

On July 9, 2020, the PAO moved to compel SCG to produce certain unredacted declarations it had produced to the

Commission in December 2019 but not to the PAO, and to assess SCG $100,000 per day in fines retroactive to June 30, 2020.

## C. Commission Ruling:  PUC Resolution ALJ-391

### 1. Original Ruling

On December 21, 2020, the Commission issued PUC Resolution ALJ-391, which it later modified, *post*, to become the operative ruling.

In it, the Commission rejected SCG's assertion that its First Amendment rights to association would be chilled by Data Request No. CalAdvocates-SC-SCG-2019-05.  Although SCG's declarations attempted to link the disclosure of such documents with a chilling effect on certain communications and contracts with outside entities, such contentions were "primarily hypothetical," and fell short of the threatened harm and "palpable fear of harassment and retaliation in recognized instances of First Amendment infringement, such as that in" *NAACP v. Alabama*, *infra*.  The Commission found "no infringement on SCG's First Amendment rights by disclosing to the Commission, including Cal Advocates, responses to Data Request No. CalAdvocates-SC-SCG-2019-05 seeking documents about its decarbonization campaign."

Even if SCG had established that responding to the data request would chill communications, the Commission found that the government's compelling interest in disclosure outweighed the chilling effect.  The Commission flatly rejected SCG's argument that it had no authority to inspect the records of investor-owned utilities concerning political activities.  On the contrary, a compelling government interest existed where the PAO's requests for information about SCG's decarbonization

11

campaign were consistent with its statutory authority to regulate investor-owned utilities.

Resolution ALJ-391 ordered SCG to comply with the PAO's discovery requests, but deferred the matter of sanctions to a later date.

SCG moved for a rehearing on Resolution ALJ-391, and moved to stay enforcement. On December 30, 2020, SCG sought an extension of time to comply with the resolution, which the Commission granted.

On December 30 and 31, 2020, the PAO moved to expedite the Commission's ruling on Resolution ALJ-391, sought an extension of time to respond to SCG's motion for rehearing, and propounded four more data requests on SCG.

## 2. Modified Ruling

On March 2, 2021, the Commission issued an order modifying Resolution ALJ-391 and denying SCG's request for a rehearing and its motion for a stay.

The Commission found that a "utility may [not] unilaterally designate certain topics off-limits to Commission oversight," and PAO discovery is the "least restrictive means of obtaining the desired information." The Commission rejected SCG's argument that the PAO's discovery rights were limited by SCG's First Amendment right to association, as well as its argument that conducting the discovery inquiry outside the confines of a formal proceeding violated SCG's procedural due process rights.

The Commission ordered SCG to produce the information and documents responsive to Request No. CalAdvocates-SC-SCG-2019-05, including confidential declarations submitted under seal to the Commission but not the PAO, and to comply with the May 5, 2020 subpoena within 30 days of the effective date of the

12

Resolution.  Although the Commission ordered SCG to provide access to unredacted versions of its confidential declarations under existing protections, it permitted the utility to file confidential versions of certain declarations under seal.  The Commission deferred consideration of the PAO's motions for contempt, sanctions and fines.

**D.     Summary**

In sum, this dispute started when, in a formal Commission proceeding, R.19-01-011, the Sierra Club exposed a potential financial relationship between SCG and C4BES.  Based on the record of that proceeding, there was no transparency as to whether the Sierra Club's allegation was correct or, if it was, whether C4BES was funded by SCG's ratepayers as opposed to shareholders.  The PAO submitted a series of discreet data requests to SCG outside of any proceeding, which led to the request in question, Data Request No. CalAdvocates-SC-SCG-2019-05, designed to discover whether SCG used ratepayer funds to finance astroturf groups.  SCG partially complied with the request but has always maintained that its shareholder information (not its ratepayer information) is privileged by constitutional rights to free speech and freedom of association.  The ALJ and full Commission both disagreed with SCG's position.

We granted SCG's petition for a writ of review of the Commission's resolution of the dispute.  The Commission filed a response supporting its decision, and SCG filed a reply challenging it.  We also granted the requests of several entities to file amicus briefs.

13

## DISCUSSION

SCG contends (1) the Commission exceeded its constitutional and statutory authority by requiring SCG to comply with the PAO's discovery requests pertaining to shareholder accounts; (2) the requests infringe on SCG's First Amendment right of association insofar as they pertain to shareholder accounts; and (3) conducting this dispute as a discovery matter rather than a formal proceeding violates procedural due process.

### A.    PAO Authority

The Commission is authorized to supervise and regulate utility monopolies.  "PUC's authority derives not only from statute but from the California Constitution, which creates the agency and expressly gives it the power to fix rates for public utilities.  (Cal. Const., art. XII, §§ 1, 6.)  Statutorily, PUC is authorized to supervise and regulate public utilities and to 'do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction' (§ 701) . . . .  Adverting to these provisions, we have described PUC as ' "a state agency of constitutional origin with far-reaching duties, functions and powers" ' whose ' "power to fix rates [and] establish rules" ' has been ' "liberally construed." ' " (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792.)

The Commission may hold hearings and establish procedures to carry out its mandate.  (See *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905; see also Cal. Const., art. XII, §§ 1-6.)

"The commission, each commissioner, and each officer and person employed by the commission may, at any time, inspect the accounts, books, papers, and documents of any public utility.  The

14

commission, each commissioner, and any officer of the commission or any employee authorized to administer oaths may examine under oath any officer, agent, or employee of a public utility in relation to its business and affairs.  Any person, other than a commissioner or an officer of the commission, demanding to make any inspection shall produce, under the hand and seal of the commission, authorization to make the inspection.  A written record of the testimony or statement so given under oath shall be made and filed with the commission."  (§ 314, subd. (a).)

These powers apply "to inspections of the accounts, books, papers, and documents of any business that is a subsidiary or affiliate of, or a corporation that holds a controlling interest in, an electrical, gas, or telephone corporation . . . with respect to any transaction between the . . . corporation and the subsidiary, affiliate, or holding corporation *on any matter that might adversely affect the interests of the ratepayers . . . .*"  (§ 314, subd. (b).)  (Italics added.)

"Every public utility shall furnish to the commission in such form and detail as the commission prescribes all tabulations, computations, and all other information required by it to carry into effect any of the provisions of this part, and shall make specific answers to all questions submitted by the commission.  [¶]  Every public utility receiving from the commission any blanks with directions to fill them shall answer fully and correctly each question propounded therein, and if it is unable to answer any question, it shall give a good and sufficient reason for such failure."  (§ 581.)

"Whenever required by the commission, every public utility shall deliver to the commission copies of any or all maps, profiles, contracts, agreements, franchises, reports, books, accounts,

papers, and records in its possession or in any way relating to its property or affecting its business, and also a complete inventory of all its property in such form as the commission may direct." (§ 582.)

"Every public utility shall furnish such reports to the commission at such time and in such form as the commission may require in which the utility shall specifically answer all questions propounded by the commission.  The commission may require any public utility to file monthly reports of earnings and expenses, and to file periodical or special reports, or both, concerning any matter about which the commission is authorized by any law to inquire or to keep itself informed, or which it is required to enforce.  All reports shall be under oath when required by the commission."  (§ 584.)

Commission employees are authorized to "enter upon any premises occupied by any public utility, for the purpose of making the examinations and tests and exercising any of the other powers provided for in this part," and to "set up and use on such premises any apparatus and appliances necessary therefor." (§ 771.)

As noted, in 1996 the Legislature created the PAO, a division within the Commission, "to represent and advocate on behalf of the interests of public utility customers and subscribers within the jurisdiction of the commission." (Stats. 2018, ch. 51, § 39.)

The PAO is authorized to "compel the production or disclosure of any information it deems necessary to perform its duties from any entity regulated by the commission, provided that any objections to any request for information shall be decided in writing by the assigned commissioner or by the

16

president of the commission, if there is no assigned commissioner." (§ 309.5, subd. (e).) Any objection to a PAO request for production is adjudicated by the PUC. (*Ibid.*)

"No information furnished to the commission by a public utility . . . , except those matters specifically required to be open to public inspection . . . , shall be open to public inspection or made public, except on order of the commission . . . or a commissioner in the course of a hearing or proceeding." (§ 583, subd. (a).)

SCG, as a public utility, is subject to the Commission's jurisdiction. (§§ 216, 218.)

## B. Standard of Review

"[A]ny aggrieved party may petition for a writ of review in the court of appeal." (§ 1756, subd. (a); see also *Pacific Bell v. Public Utilities Com'n* (2000) 79 Cal.App.4th 269, 278.)

"There is a strong presumption of validity of the commission's decisions." (*Greyhound Lines, Inc. v. Public Utilities Commission* (1968) 68 Cal.2d 406, 410 (*Greyhound*).)

Review of a Commission decision "shall not extend further than to determine, on the basis of the entire record . . . whether any of the following occurred: [¶] (1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The decision of the commission is not supported by the findings. [¶] (4) The findings in the decision of the commission are not supported by substantial evidence. [¶] (5) The order or decision was procured by fraud or was an abuse of discretion. [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a)(1)-(6).)

17

We give great weight to the Commission's interpretation of the Public Utilities Code, as that agency is constitutionally authorized to administer its provisions (*Southern California Edison v. Peevey*, *supra*, 31 Cal.4th at p. 796), and will disturb its interpretation only if "it fails to bear a reasonable relation to statutory purposes and language" (*Greyhound*, *supra*, 68 Cal.2d at pp. 410-411). We do not conduct a trial de novo, nor weigh nor exercise independent judgment on the evidence. (§ 1757, subd. (b); see *Eden Hosp. Dist. v. Belshe* (1998) 65 Cal.App.4th 908, 915.) The Commission's findings of fact " 'are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence. [Citation.] . . . "When conflicting evidence is presented from which conflicting inferences can be drawn, the PUC's findings are final." ' " (*Clean Energy Fuels Corp. v. Public Utilities Com.* (2014) 227 Cal.App.4th 641, 649; see also *Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 537-538.)

"Notwithstanding Section[] 1757 . . . , in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the United States Constitution or the California Constitution, the Supreme Court or court of appeal shall exercise independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the constitutional question shall not be final." (§ 1760.) "But even the presence of a constitutional dispute does not require the reviewing court to adopt de novo or independent review. Even there, 'the question of the weight of the evidence in determining issues of fact lies with the commission acting within its statutory authority; the "judicial duty to exercise an independent judgment does not

18

require or justify disregard of the weight which may properly attach to findings upon hearing and evidence." ' [Citation.] In other words, judicial reweighing of evidence and testimony is ordinarily not permitted." (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 838.)

## C. Application

Pursuant to the Commission's broad constitutional and statutory authority, SCG is required to respond to the PAO's data requests of its SAP accounting system unless to do so would violate SCG's constitutional rights.

SCG argues the PAO's data requests infringe on its First Amendment rights with no substantial relation between the requests and a sufficiently important governmental interest. We agree.

### 1. SCG's Due Process Rights

SCG contends that the PAO's discovery "non-proceedings" constitute a "largely rules-free no-man's-land" of "unbounded discovery and investigatory authority." It argues that conducting this dispute as a discovery matter outside the confines of a formal proceeding, where the Commissions Rules of Practice and Procedure and filing requirements do not directly apply, violates procedural due process. We disagree.

A regulatory agency enjoys flexibility in fashioning the procedures necessary to exercise its responsibilities. Nevertheless, the PAO's use of ad hoc procedures must be consistent with due process. (*San Pablo Bay Pipeline Co., LLC v. Public Utilities Com.* (2015) 243 Cal.App.4th 295, 313; Cal. Const. art. XII, § 2 [Commission procedures are "[s]ubject to statute and due process"].)

19

Procedural due process requires that a party be given notice and an opportunity to be heard when a government action threatens deprivation of liberty or property. (*Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 564, 569-571.)

Here, the dispute started when, in a formal Commission proceeding, R.19-01-011, a potential financial relationship between SCG and C4BES came to light in a pleading filed by the Sierra Club. Based on the record of that proceeding, the PAO submitted a series of discreet Data Requests to SCG outside of any proceeding, which led to the Data Request in question, Data Request No. CalAdvocates-SC-SCG-2019-05, designed to discover whether SCG used ratepayer funds to finance astroturf groups. SCG only partially complied with the request, maintaining that its shareholder information (not its ratepayer information) was privileged by constitutional rights to free speech and freedom of association.

The PAO then invoked section 309.5, which allows it to compel "production or disclosure of any information it deems necessary to perform its duties from any entity regulated by the commission" and to bring any resulting discovery disputes to the President of the Commission.

The President of the Commission referred the matter to the Chief Administrative Law Judge to provide for a procedural path to address the dispute. The Chief Administrative Law Judge assigned an ALJ to preside over the dispute, and provided the parties with certain procedural rules to follow.

At each step of this process, the PAO defended discrete discovery requests focused on the information needed to perform its statutory duties. SCG had an opportunity to challenge the PAO's motions, submit motions itself, and move for the full

20

Commission to act on its requests.  SCG neither requested evidentiary hearings nor contested relying on written pleadings to resolve the issues set forth herein.

Under these circumstances, we conclude SCG has been afforded ample due process.

### 2.    SCG's First Amendment Rights

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'  This [includes] . . . 'a corresponding right to associate with others.'  [Citation.]  Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'  [Citation.]  Government infringement of this freedom 'can take a number of forms.' " (*Americans for Prosperity Foundation v. Bonta* (2021) ___U.S.___ [141 S.Ct. 2373, 2382, 210 L.Ed.2d 716, 726-727] (*Americans for Prosperity*).)  For example, freedom of association may be violated "where individuals are punished for their political affiliation," "or where members of an organization are denied benefits based on the organization's message." (*Ibid*.)

"[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." (*National Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson* (1958) 357 U.S. 449, 462 [78 S.Ct. 1163, 2 L.Ed.2d 1488] (*NAACP v. Alabama*).)  "*NAACP v. Alabama* involved this chilling effect in its starkest form.  The NAACP opened an Alabama office that supported racial integration in higher

21

education and public transportation.  [Citation.]  In response, NAACP members were threatened with economic reprisals and violence.  [Citation.]  As part of an effort to oust the organization from the State, the Alabama Attorney General sought the group's membership lists.  [Citation.]  We held that the First Amendment prohibited such compelled disclosure." (*Americans for Prosperity*, *supra*, 210 L.Ed.2d at pp. 726-727.)  The Supreme Court explained that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and noted there was a "vital relationship between freedom to associate and privacy in one's associations." (*NAACP v. Alabama*, at pp. 460, 462.)  "Because NAACP members faced a risk of reprisals if their affiliation with the organization became known—and because Alabama had demonstrated no offsetting interest 'sufficient to justify the deterrent effect' of disclosure, [citation]—we concluded that the State's demand violated the First Amendment." (*Americans for Prosperity*, at p. 727.)

When compelled disclosure is challenged on First Amendment grounds, we apply a standard of "exacting scrutiny" to the government's action.  (*Americans for Prosperity*, *supra*, 210 L.Ed.2d at p. 727.)  "Under that standard, there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.' [Citation.] 'To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.' [Citation.]  Such scrutiny . . . is appropriate given the 'deterrent effect on the exercise of First Amendment

22

rights' that arises as an 'inevitable result of the government's conduct in requiring disclosure.' " (*Ibid.*)

"A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment privilege." (*Perry v. Schwarzenegger* (9th Cir. 2010) 591 F.3d 1147, 1160.) "[A] claim of First Amendment privilege is subject to a two-part framework. The party asserting the privilege 'must demonstrate . . . a "prima facie showing of arguable first amendment infringement." ' [Citation.] 'This *prima facie* showing requires appellants to demonstrate that enforcement of the [discovery requests] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or "chilling" of, the members' associational rights.' [Citation.] [¶] 'If appellants can make the necessary *prima facie* showing, the evidentiary burden will then shift to the government . . . [to] demonstrate that the information sought through the [discovery] is rationally related to a compelling governmental interest . . . [and] the "least restrictive means" of obtaining the desired information.' " (*Id.* at pp. 1160-1161, fn. omitted.) "To implement this standard, we 'balance the burdens imposed on individuals and associations against the significance of the . . . interest in disclosure,' [citation], to determine whether the 'interest in disclosure . . . outweighs the harm.' " (*Id.* at p. 1161.) This balancing may consider, for example, the seriousness of the threat to the exercise of First Amendment rights against the substantiality of the state's interest. (*Ibid.*) "The argument in favor of upholding the claim of privilege will ordinarily grow stronger as the danger to rights of

23

expression and association increases." (*Black Panther Party v. Smith* (D.C. Cir. 1981) 661 F.2d 1243, 1267.)

A prima facie showing requires more than bare allegations of possible First Amendment violations. " '[T]he record must contain "objective and articulable facts, which go beyond broad allegations or subjective fears." ' " (*Dole v. Local Union 375, Plumbers Intern. Union of America, AFL-CIO* (9th Cir. 1990) 921 F.2d 969, 973 (*Dole*); see also *Brock v. Local* 375 (9th Cir. 1988) 860 F.2d 346, 350, fn. 1.)

Here, SCG argued before the Commission, and reasserts in these writ proceedings, that Data Request No. CalAdvocates-SC-SCG-2019-05 seeks information about shareholder funding of SCG's decarbonization campaign, which constitutes political activity. SCG argues that insofar as the PAO seeks this information, its data request chills its First Amendment rights.

In support of its argument, Sharon Tomkins, SCG's Vice President of Strategy and Engagement and Chief Environmental Officer, declared that if SCG's non-public contracts and communications were disclosed to the Commission there would be a "chilling effect on [SCG] and [its] ability to engage in activities which are lawful," which "could limit [SCG's] future associations" because she and SCG would "need to take into consideration the potential disclosure of [sensitive communications] in the future as a result of such forced [discovery] disclosure." Tompkins declared that "Based on conversations [she] had, others may be less likely to associate with [SCG]" if information about its political efforts were disclosed to the Commission. Three declarants from private organizations specializing in government relations and public affairs stated that disclosure of shareholder information to the

24

Commission would dissuade them from communicating or contracting with SCG.

Tomkins's concern that disclosure of political information to the Commission will cause her to "take into consideration" whether sensitive communications will be revealed constitutes nothing more than a circular argument about a subjective fear. Tompkins said nothing about how the requested disclosure "is itself inherently damaging to the organization or will incite other consequences that objectively could dissuade persons from affiliating with the organization." (*Dole*, *supra*, 921 F.2d at p. 974.) In *NAACP v. Alabama*, for example, the NAACP proved that disclosure of its membership roles would subject its members to economic reprisals and threats of physical coercion. (*NAACP v. Alabama*, *supra*, 357 U.S. at p. 462.)

However, Tompkins voiced a concern about membership discouragement or withdrawal, supported by three declarations from representatives of entities who stated they would be less likely to associate with SCG if information about their political efforts were disclosed to the Commission. These declarations presented objective and articulable facts, beyond broad allegations or subjective fears, suggesting that enforcement of the data requests insofar as they pertained to shareholder expenditures would incite "consequences that objectively could dissuade persons from affiliating with the organization." (*Dole*, *supra*, 921 F.2d at pp. 973, 974.) It is not SCG's subjective fear that disclosure of shareholder expenditure information would dissuade third parties from communicating or contracting with SCG: Several third parties told them it would.

The Commission argues that pursuant to section 583, which prohibits public disclosure of information obtained by the

25

PAO in discovery, shareholder information disclosed to the PAO would remain confidential. The point is irrelevant because SCG's evidence demonstrates that disclosure to the PAO itself would chill third parties from associating with the utility.

Because SCG demonstrated that a threat to its constitutional rights exists, the burden shifted to the Commission to demonstrate that the data requests serve and are narrowly tailored to a compelling governmental interest.

### 3. Governmental interests

A governmental entity seeking discovery must show that the information sought is highly relevant to the claims or defenses in the proceeding at hand. (*Perry v. Schwarzenegger*, *supra*, 591 F.3d at pp. 1160-1161.) "The request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable." (*Id*. at p. 1161.)

A regulated utility may not use ratepayer funds for advocacy-related activities that are political or do not otherwise benefit ratepayers. (*Southern California Edison Co*. (2012) Cal.P.U.C. (Nov. No. 12-11-051) [Lexis 555, *765] [finding that membership subscriptions to organizations that advance tax reduction policies are inherently political, and funding should not be permitted under rate recovery]; *Southern California Gas Co*. (1993) Cal.P.U.C. (Dec. No. 93-12-043) [Lexis 728, *103] [finding that "ratepayers should not have to bear the costs of public relations efforts in this area, which according to [SCG], are designed primarily to increase load by promoting natural gas use to business and government leaders"].)

The PAO's statutory mandate is to "obtain the lowest possible rate for service," primarily for residential and small

26

commercial customers.  (§ 309.5, subd. (a).)  In service of this mandate, the PAO may compel regulated entities to produce or disclose information "necessary to perform its duties"—i.e., information relating to "rate[s] for service."  (*Id.* at subds. (a), (e); see § 314.)

As an investor-owned utility, SCG differentiates between shareholder funds and ratepayer funds, and claims to use only shareholder funds for lobbying activities.  Although regulation of the utility requires understanding whether SCG provides accurate information regarding the allocation of its advocacy costs between ratepayer and shareholder accounts, this may be learned simply by examining ratepayer expenditures.  If ratepayers do not pay for advocacy-related activities, the PAO's mandate is satisfied.

However, the PAO's discovery inquiries into all sources of funding for SCG's lobbying activities go beyond ratepayer expenditures.  Insofar as the requests seek information about shareholder expenditures, they exceed the PAO's mandate to obtain the lowest possible costs for ratepayers and its authority to compel disclosure of information necessary for that task.

The requests therefore are not carefully tailored to avoid unnecessary interference with SCG's protected activities.

The Commission argues that the PAO's discovery rights are "essentially coextensive" with the Commission's own rights. We disagree.  The PAO is authorized to compel only that discovery which is "necessary to perform its duties."  (§ 309.5, subd. (e).)  The PAO's and Commission's discovery rights would be coextensive only if their duties were the same, which of course they are not.  (See § 309.5, subd. (a) [explaining the PAO's mandate].)

27

The Commission argues the PAO is authorized to ensure that "advocacy costs have been booked to the appropriate utility accounts." With respect, we disagree. The PAO is authorized to ensure only that advocacy costs are *not* booked to *ratepayer* accounts. This it may do by examining ratepayer, not shareholder, accounts. SCG has repeatedly offered access to ratepayer accounts.

The Commission argues that sometimes SCG misclassifies expenditures, and has at times moved expenditures from ratepayer to shareholder accounts. But this just shows that a less invasive discovery process is working, and the PAO can confirm that no funds have been misclassified to ratepayer accounts by reviewing above-the-line accounts.

### 4. Contempt and Sanctions

In its briefing and at oral argument petitioner raised the issue of looming sanctions based on actual or potential contempt findings, although no sanctions are currently accreting. Because we will vacate Resolution ALJ-391 insofar as it compels disclosure of shareholder expenditures, no basis for sanctions exists.

### DISPOSITION

The petition for writ of mandate is granted. Commission Resolution ALJ-391 is vacated with respect to shareholder data sought by the Commission for which petitioner asserts its First Amendment right of association. Resolution ALJ-391 is affirmed in all other respects.

28

CERTIFIED FOR PUBLICATION

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.